UNITED STATES of America

v.

Clyde P. WILLIS, Jr., Robert H. Love
and Christopher R. Pieser.

No. 79–321.

United States District Court,
E. D. Louisiana.

Aug. 24, 1979.

Ronald A. Fonseca, Asst. U.S. Atty., U.S. Dept. of Justice, New Orleans, La., for plaintiff-petitioner.

Louis B. Merhige, New Orleans, La., for defendants; Andrew C. Pavlick, Miami, Fla., of counsel.

DUPLANTIER, District Judge.

After an evidentiary hearing, the court denied defendants' motion to suppress as evidence approximately fifteen tons of marijuana seized by Coast Guard personnel from the fish hold of a fishing vessel being operated by the three defendants.

At approximately 1:00 A.M. on June 20, 1979, a boarding party from the Coast Guard cutter "Point Sal" boarded the fishing boat "Seaman Blues" at a point about 43 miles from the Louisiana shore in the Gulf of Mexico. Coast Guard aircraft from

Mobile, Alabama and Grand Isle, Louisiana had been observing the "Seaman Blues" for about five hours before the boarding took place. The crew of the Coast Guard cutter as well as the crew of at least one of the aircraft had been informed by their dispatching officers that the "Seaman Blues" was suspected of drug activity. The government produced no evidence as to the reasons for the suspicion.

The Coast Guard boarding party consisted of four men, all armed, commanded by Tim Cox, a noncommissioned officer. Two members of the boarding party took defendants Love and Pieser to the stern of the vessel while Cox and the fourth officer, Bills, conducted an inspection of the vessel with defendant Willis, who was identified as the vessel's captain. The inspection commenced in the wheelhouse, where ship's documents were checked. The documents were found to be in order, except that Willis had not been "signed on" as skipper. Cox and Bills, accompanied by Willis, then went to the mess deck, to check for flotation devices, then to the engine room to check for fire extinguishers and bilge pumps. In the engine room, the vessel's identification numbers were observed painted on one of the bulkheads. Cox, Bills, and defendant Willis then went on deck, where Cox told Willis to open the hatch cover to the fish hold of the vessel. When officer Bills shined a flashlight into the hold he observed a number of burlap bags, some marked "Product of Colombia," which smelled like marijuana. Cox and Bills arrested the defendants and seized the marijuana which is the subject of the Motion to Suppress.

1. *The initial stop, boarding, and inspection.*

■ The Coast Guard has plenary authority to stop and board any American flag vessel beyond the twelve-mile limit. Once aboard the vessel, they may then conduct documentation and safety inspections. 14 U.S.C. § 89(a), *U. S. v. Warren*, 578 F.2d 1058 at 1064–1065 (5th Cir., 1978) (*en banc*).

Defendants argue, however, that the real purpose of the stop and boarding was to search for marijuana. Indeed, Cox testified that this was *his* purpose in boarding the ship. However, his subjective intent cannot change what would otherwise be a valid stop and entry into an illegal one. What Cox was thinking at the time of the boarding is simply irrelevant. *U. S. v. Hillstrom*, 533 F.2d 209 at 211 (5th Cir. 1976).

2. *The search of the fish hold*

■ Cox testified that the purpose of opening the hold was to look for illegal fish and smuggling activities: "There are several statutes that we check for, generally." Bills testified that his purpose was to find the main beam identification number in the hold, because, in his view, the painted number on the bulkhead in the engine room was not sufficient under the applicable regulations: "The normal place on a vessel of that type for the main beam is in the ice hold, on the forward bulkhead."

The entry into the fish hold was justified by a statute concerning fishing and by regulations as to the vessel's markings:

16 U.S.C. § 971f:

(a) Any person authorized in accordance with the provisions of this chapter [1] to enforce the provisions of this chapter and the regulations issued thereunder may—

(1) with or without a warrant, board any vessel subject to the jurisdiction of the United States and inspect such vessel and its catch . . .

46 CFR § 67.15–1: *Requirement for proper marking.*

Except as provided for in § 67.75–17(a), marine documents shall not be issued until proper evidence is produced that the official number and net tonnage have been properly marked upon the vessel's main beam (see § 69.05–1 of this chapter) and that her name and hailing port have been properly marked as provided in Subpart 67.13.

46 CFR § 69.05–1: *Marking net tonnage and official number on vessel.*

(a) The official number of a vessel preceded by the abbreviation "No.", and the

1. Coast Guard personnel—See § 971d(b)

net tonnage, preceded by the word "NET", shall be marked in a conspicuous place on her main beam at the expense of the owner or master, in Arabic numerals of the block type at least 3 inches in height, when the size of the main beam will permit. If the main beam is of wood, it shall be carved or branded in figures not less than three-eights of an inch in depth. If the main beam is of iron or other metal, the official number and net tonnage shall be outlined by punch marks and painted over with oil paint in a light color on a dark background or a dark color on a light background.

Thus the Coast Guard did have two legitimate reasons to enter the fish hold of the vessel, to check for the vessel number on the main beam and to inspect the catch.

Again, defendants argue that because Cox, who was in charge of the inspection party, admitted he was looking for drugs, his bad purpose renders the search of the hold illegal.

But if the search of the hold was valid pursuant to the Coast Guard's authority to check for illegal fish and for an identification number on the main beam, then the fact that Cox's personal motive was also to look for drugs is irrelevant. *Hillstrom, supra.*

■ Of course, if the above statute and regulations conflict with the Fourth Amendment, they cannot stand and the search would be unlawful. However, the court is convinced that these statutes and regulations, interpreted as authorizing the Coast Guard to search the hold of a commercial fishing vessel, are valid and do not infringe Fourth Amendment rights.

Our attention has been called to no case where the Coast Guard's search of the commercial hold of a commercial vessel on the high seas has been held to be illegal. In most Fifth Circuit cases involving similar circumstances, the court has justified the search of a ship's hold on grounds amounting to probable cause. In *U. S. v. Williams,* 589 F.2d 210, 214 (1979), a panel of the Fifth Circuit held that crew members of a commercial vessel have no legitimate expectation of privacy in the cargo hold, and thus "as a matter of substantive fourth amendment law," evidence seized in the course of a warrantless search of the vessel's hold is admissible. *Williams* has been accepted for rehearing *en banc, U. S. v. Williams,* 600 F.2d 18 (5th Cir. 1979), and the panel's decision has therefore been vacated.[2] Although the decision has no binding effect, the court finds it nonetheless persuasive.

■ Under the circumstances involved in this case, the defendants had no legitimate expectation of privacy with respect to the fish hold of the "Seaman Blues." This case does not involve a search of living quarters or other places where there may be a legitimate expectation of privacy. The fish hold is not a place where one keeps personal belongings. Members of the crews of commercial vessels should know and expect that the hold may be subject to routine inspection by the Coast Guard or Customs when the vessel leaves or enters a U. S. port. There is no reason why the hold of a commercial vessel should be considered any more private when the vessel is on the high seas.

---

**2.** See 5th Circuit Local Rule 17.