**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mark J. KENT, Defendant-Appellant.**

**No. 81–5776.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 22, 1982.

Richard A. Gargiulo, Constance L. Rudnick, Boston, Mass., Michael A. Lipsky, Mandina & Lipsky, Philip J. Mandina, Miami, Fla., for defendant-appellant.

Robert J. Bondi, James S. McAdams, III, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, and ANDERSON, Circuit Judge, and HOFFMAN *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant was charged with possession of marijuana with intent to distribute in violation of 21 U.S.C.A. § 841(a)(1) (West 1981). Appellant was convicted in a bench trial and appeals the denial of his motion to suppress evidence. We affirm.

---

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

## I. FACTS

At approximately 4:30 P.M. on March 7, 1980, an informant notified the Customs Patrol office in Miami that a 50-foot, white, yacht-type vessel with three persons on board would be coming into the area of the Coral Gables Waterway within an hour carrying a load of marijuana. The Customs Patrol promptly launched a Customs vessel which proceeded to the Coral Gables Waterway area. At approximately 5:15 P.M., Customs Patrol Officer Joseph Brookins observed a vessel which matched the description provided by the informant. The vessel, which was subsequently identified as the SUNDANCER, was entering the first waterway south of the Coral Gables Waterway and was the only vessel observed in the area at that time.

After maintaining visual contact with the SUNDANCER for approximately thirty minutes, the Customs vessel drew alongside and asked the captain, later identified as appellant Kent, where the SUNDANCER was coming from. Kent responded that he was coming from the West Palm Beach area. Officer Brookins believed that this was an "unusual response" because the SUNDANCER had been heading in a northwesterly direction when originally sighted.[1] Brookins also asked Kent where the SUNDANCER was going to dock, but Kent did not give an answer to this inquiry. Officer Brookins then decided to board the SUNDANCER, and Kent apparently agreed to permit the boarding.[2]

After boarding the SUNDANCER, Brookins asked Kent for the ship's documents. While Brookins accompanied Kent to look for the documents,[3] the other Customs Patrol officer who boarded the ship, James Carlin, began to look around the vessel. When he examined the pilot house, Carlin discovered an open doorway leading from the pilot house to the interior of the vessel. Carlin stepped into the doorway, bent over slightly due to a partially closed partition above the doorway, and took one or two steps down the stairwell leading into the lounge area. From that position, Carlin observed several large bales wrapped in burlap through a half-open door at the opposite end of the lounge which led to the forward stateroom. Recognizing that the bales were characteristic of marijuana, Carlin proceeded forward through the lounge and the galley to the forward stateroom. Carlin then confirmed that the bales contained marijuana and learned that both the forward and rear staterooms were filled with marijuana bales. Carlin informed Officer Brookins about his discoveries, and the Customs Patrol officers arrested Kent and the two other individuals on board the SUNDANCER.

## II. THE STOP AND BOARDING OF THE SUNDANCER

■ The first issue presented on this appeal is the constitutionality of the stop and boarding of the SUNDANCER. Our cases hold that Customs officers may make investigatory stops of vessels on inland waters "on facts which justify a reasonable suspicion of illegal activity." *United States v. Ruano,* 647 F.2d 577, 579 (5th Cir. 1981);[4] *United States v. D'Antignac,* 628 F.2d 428, 434 (5th Cir.1980), *cert. denied,* 450 U.S. 967,

---

1. After examining nautical maps at the suppression hearing, Officer Brookins conceded that the SUNDANCER could have been coming from the West Palm Beach area even though it was heading northwest when sighted.

2. The government contends that Kent consented to both the boarding and a search of the SUNDANCER. Because we conclude below that the officers' reasonable suspicion justified the boarding and that the officers then found the marijuana in plain view, we need not consider the consent issue.

3. Kent apparently was unable to produce the documents.

4. In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *United States v. Serrano,* 607 F.2d 1145, 1148 (5th Cir. 1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 and 446 U.S. 910, 100 S.Ct. 1838, 64 L.Ed.2d 263 (1980). The crucial question, therefore, is whether the Customs Patrol officers who stopped and boarded the SUNDANCER had knowledge of facts which justified a reasonable suspicion of illegal activity.

■ We agree with the district court that the information contained in the informant's tip coupled with the subsequent verification of that information gave the Customs Patrol officers a reasonable suspicion that the SUNDANCER was engaged in illegal activity. The tip indicated that a 50-foot, white, yacht-type vessel with three people on board would enter the area of the Coral Gables Waterway within an hour carrying a large load of marijuana. When the officers investigated this information, they found a vessel which matched the description given by the informant, which had three people on board, and which was entering the Coral Gables Waterway area at the time designated by the informant. Further, the Customs Patrol officers sighted no other vessels in the Coral Gables Waterway area at that time. These facts corroborated the information contained in the informant's tip.

Appellant argues, however, that the corroborated tip could not properly provide the basis for a reasonable suspicion of illegal activity. Appellant contends that the tip was unsupported by any indicia of the informant's reliability because the government did not present evidence which established the reliability of the informant or disclosed the source of the informant's information. Consequently, appellant argues, the Customs Patrol officers did not have a reasonable suspicion of illegal activity when they stopped and boarded the SUNDANCER. We disagree.

■ Admittedly, the record does not establish the informant's past reliability or disclose the manner in which the informant obtained his information. The Customs Patrol officer who received the tip testified only that he knew the informant and had talked to him in the past. A tip from an informant of unknown reliability ordinarily will not create a reasonable suspicion of criminality. *See United States v. McLeroy,* 584 F.2d 746 (5th Cir. 1978). *Cf. Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). However, the tip was not so completely lacking in indicia of reliability that the Customs Patrol officer had to "shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams v. Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972).

We believe that the tip the Customs Patrol officer received was similar to the tip in *Adams v. Williams, supra.* In that case, an informant of unproven reliability advised a police officer that "an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." *Id.* at 145, 92 S.Ct. at 1923. The Court found that the tip carried enough indicia of reliability to justify the officer's forcible stop of the defendant. The Court based its decision on the fact that "[t]he informant was known to [the officer] personally and had provided him with information in the past." *Id.* at 146, 92 S.Ct. at 1923. Thus, the Court found that the tip had more indicia of reliability than "in the case of an anonymous telephone tip," *id.,* and, therefore, the officer had reasonable cause to act on it. The Court's description of the tip in *Adams v. Williams* also applies to the tip the Customs Patrol received in this case. Consequently, we believe the tip must be given considerable weight when determining whether the officers had a reasonable suspicion of criminality sufficient to justify the stop and boarding of the SUNDANCER.[5]

After the Customs Patrol officers received the tip, they conducted an indepen-

**5.** Other courts have recognized the difference between a tip from an anonymous telephone

dent investigation of the information provided by the informant. This court has held that "[w]here insufficient information about the tip and the tipster is available to justify reliance on it alone, investigating officers may supplement the tip by surveillance of the subject or corroboration of key elements of the tip from relatively objective sources." *United States v. Brennan,* 538 F.2d 711, 720 (5th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977). This court also has stated that "corroboration of innocent details might change an otherwise insubstantial tip into a proper basis for a reasonable suspicion of criminality." *United States v. McLeroy,* 584 F.2d at 748.[6] In this case, the informant gave relatively detailed information regarding the description and location of a vessel carrying marijuana. This information was not "readily available to many persons," *United States v. McLeroy,* 584 F.2d at 748, and could not "easily have been obtained from an offhand remark heard at a neighborhood bar." *Spinelli v. United States,* 393 U.S. at 417, 89 S.Ct. at 589. Rather, the information provided by the informant, particularly the vessel's location at a particular place and time, inferred "that the informant had

gained his information in a reliable way." *Spinelli v. United States,* 393 U.S. at 417, 89 S.Ct. at 589. *See also Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Only a person with personal knowledge of a vessel's activities would have been able to accurately predict the vessel's location in the future.[7] The Customs Patrol officers' subsequent verification of the informant's tip provided the corroboration necessary to justify a reasonable suspicion that the SUNDANCER was engaged in illegal activity.

█ Several previous decisions by this court support our conclusion that a tip from a known, albeit unproven, informant coupled with subsequent corroboration of the tip's details can justify a reasonable suspicion of criminality. In *United States v. Afanador,* 567 F.2d 1325 (5th Cir. 1978), for example, this court upheld the strip search of an airline stewardess based on a tip from a first-time informant which indicated that the stewardess would arrive on a particular flight into Miami body-carrying cocaine. The court noted that the authorities had ascertained that the informant was not being paid for the information and had no

---

informant and an informant who, while of unproven reliability, is known to the law enforcement officer. *See, e.g., United States v. Sierra-Hernandez,* 581 F.2d 760, 763 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) ("Unlike a person who makes an anonymous phone call ... the informant was in a position to be held accountable for his intervention. The reliability of the information was thus increased.").

**6.** After making the statement quoted in the text, the court in *United States v. McLeroy* went on to hold that the facts known to the law enforcement officers did not justify an investigative stop of the defendant's automobile. The police had stopped the automobile after receiving information that a black and white chevrolet with a particular license number was parked at the defendant's home. The tipster indicated that the vehicle had a damaged right side, was possibly stolen, and might have been involved in a hit-and-run accident. The tipster also suggested that the defendant might be carrying a sawed-off shotgun. There was no indication that the police had talked to the informant previously, and "the only elements of the tip

corroborated by the police investigation were the suspect's name and address and the description of his automobile." 584 F.2d at 748. The court observed that the informant's knowledge of "these few corroborated facts in no way suggests that the informant knew more personal facts about McLeroy, such as whether he was involved in crime." *Id.* In the present case, in contrast, the Customs Patrol officers had talked to the informant previously and the tip included information, such as the location of the vessel at a particular place and time, which, when corroborated, suggested that the informant had personal knowledge of the defendant's activities. Thus, the factual setting of this case is distinguishable from *United States v. McLeroy.*

**7.** It is possible that a tip describing a vessel and accurately predicting its future location could come from a prankster who merely observed the vessel's location, speed and heading. That is a remote possibility in this case, however, because the Customs Patrol officer who received the tip knew the informant's identity.

criminal record, facts which are not present in this case; however, the information provided by the informant in *United States v. Afanador, supra,* was not nearly as detailed as the information which the Customs Patrol officers received and verified before stopping and boarding the SUNDANCER. *See also United States v. Worthington,* 544 F.2d 1275, 1279 (5th Cir.) (although tip was "lacking in detail," agents had reasonable suspicion for investigatory stop when tip's accuracy and reliability were corroborated by subsequent surveillance), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977). *Cf. United States v. Nunn,* 525 F.2d 958, 959 n. 2 (5th Cir. 1976) (anonymous tip indicated that illegal aliens could be found in open bed of two-tone late model Ford pick-up being driven north on a certain highway by two black men; dicta suggests that investigatory stop of vehicle fitting that description was justified); *Bailey v. United States,* 386 F.2d 1 (5th Cir. 1967), *cert. denied,* 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968) ("The veracity of an unknown informer can be sufficiently determined by the searching officer's personal observation of some activity which is consistent with the tip but which would appear harmless without it.").[8]

In summary, we hold that the Customs Patrol officers who stopped and boarded the SUNDANCER had facts which justified a reasonable suspicion of illegal activity. Although the tip which they received was from an informant of unproven reliability, the tipster's identity was known and he had talked to one of the officers in the past, the tip included facts regarding a vessel's future location which normally would be available only to a limited number of persons who had personal knowledge of the vessel's activities, the information contained in the tip could be objectively verified, and the officers' subsequent investigation corroborated every key element of the tip except the presence of marijuana. Under these circumstances, the stop and boarding of the SUNDANCER was not unreasonable and, therefore, did not contravene the Fourth Amendment.[9]

### III. THE DISCOVERY OF THE MARIJUANA

█ The second issue presented by this appeal is the constitutionality of the discovery of marijuana in the interior of the SUNDANCER. The government contends

---

**8.** We believe that the facts of this case present a stronger basis for a reasonable suspicion of criminality than the facts in several other circuit court decisions which have upheld investigatory stops based on the corroboration of innocent details contained in tips received from *anonymous* informants. *See United States v. McClinnhan,* 660 F.2d 500, 502 (D.C.Cir.1981) (reasonable suspicion necessary to justify stop and frisk could be based on "anonymous tip that, while lacking indicia of reliability, was corroborated in every significant detail" by pre-stop observation); *United States v. White,* 648 F.2d 29, 43 (D.C.Cir.1981) ("An anonymous tip about an ongoing transaction, detailed as to time and place, including a specific description of one of the participants and their vehicles as well as their *modus operandi,* and verified by the officers through surveillance in all details except for the actual possession or exchange of narcotics provides a sufficient basis for a legitimate *Terry* stop to question the occupants as to their identity and visually check inside the car."); *United States v. Andrews,* 600 F.2d 563, 569 (6th Cir.) (anonymous tipster's description of defendant and accurate prediction that defendant would arrive on flight from Los Ange-

les to deliver drugs to named individual provided enough detail to indicate that tip was not fabricated "out of whole cloth" and satisfy the lowered standard of reasonable suspicion), *cert. denied sub nom. Brooks v. United States,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979).

**9.** Because we believe that the corroboration of the informant's tip justified a reasonable suspicion of criminal activity, we do not need to consider the effect of Officer Brookins' questions and Kent's unsatisfactory responses when the Customs Patrol vessel drew alongside the SUNDANCER. At oral argument, the government's attorney suggested that the Customs Patrol officers did not stop the SUNDANCER until after questioning Kent. If that were the case, Kent's unsatisfactory responses gave the officers additional information to justify the stop and boarding of the SUNDANCER. Even if the officers stopped the SUNDANCER before asking questions, we note they did not take the more intrusive step of boarding the SUNDANCER until after questioning Kent.

that Officer Carlin observed the marijuana in plain view from a position where he had a legitimate right to be.[10] Appellants argue that the plain view doctrine does not justify Officer Carlin's discovery of the marijuana.

Under the plain view doctrine, "[a] law enforcement officer may seize an item in plain view without a warrant if the officer (1) has an independent and legally sufficient justification for being in the position from which he can view the item, (2) immediately recognizes the item as evidence, and (3) discovers the evidence inadvertently." *United States v. Antill,* 615 F.2d 648, 649 (5th Cir.), *cert. denied,* 449 U.S. 866, 101 S.Ct. 200, 66 L.Ed.2d 85 (1980). *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564 (1971). *See also United States v. Diecidue,* 603 F.2d 535 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 and 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *United States v. Duckett,* 583 F.2d 1309 (5th Cir. 1978). Appellant argues that Officer Carlin's discovery of the marijuana did not meet the first two prongs of this test.

Appellant's first contention is that Officer Carlin did not view the marijuana from a position where he had a right to be. Appellant points out that Officer Carlin took one or two steps down a stairway leading to the lounge area of the SUN-DANCER before he observed the marijuana bales. This action, appellant argues, consti-

tuted an unreasonable intrusion into the vessel's "private living quarters" in violation of the Fourth Amendment.[11]

This court has not yet determined the minimum degree of suspicion necessary for law enforcement officers to search the private living quarters of a vessel. *See United States v. Gray,* 659 F.2d 1296, 1299 (5th Cir. 1981) (Unit B);[12] *United States v. De-Weese,* 632 F.2d 1267, 1270–71 (5th Cir. 1980); *United States v. Williams,* 617 F.2d 1063, 1087 (5th Cir. 1980) (en banc); *United States v. Whitmire,* 595 F.2d 1303, 1316 (5th Cir. 1979), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). However, we find it unnecessary to resolve that issue because we believe that, under the circumstances of this case, Officer Carlin's decision to step through the open door onto the stairway leading to the lounge area was justified as part of the protective sweep that law enforcement officers are permitted to make after boarding a vessel.

*United States v. Alfrey,* 620 F.2d 551, 555 (5th Cir.), *cert. denied,* 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), held that when law enforcement officers board a vessel they have a right to conduct a limited topside inspection to ascertain whether all persons on board are accounted for. The rationale for permitting such an inspection is to insure the safety of the officers as they go about their duties. *Id.* In this case, the Customs Patrol officers already had a reasonable suspicion that the SUN-

---

**10.** Our conclusion that the marijuana was discovered in plain view makes it unnecessary to consider the government's additional argument that the defendant does not have standing to contest the discovery of the marijuana.

**11.** We need not decide whether appellant has properly characterized the entire interior of the SUNDANCER as "private living quarters." The vessel's interior included a lounge area, a galley, and two staterooms. Both the lounge area and the galley apparently were open to all persons on board the vessel. We note that dicta in one of our prior cases involving a commercial, as opposed to a private, vessel indicates that "neither captain nor crew has a legitimate expectation of privacy protected by the Fourth Amendment in an area which is

subject to the common access of those legitimately aboard the vessel." *United States v. Freeman,* 660 F.2d 1030, 1034 (5th Cir. 1981). *See also United States v. DeWeese,* 632 F.2d 1267, 1270–71 (5th Cir. 1980), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). For the purposes of this opinion, we assume *arguendo,* without deciding, that the lounge area was part of the "private living quarters" of the vessel.

**12.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir. 1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34.

DANCER was engaged in criminal activity and, therefore, had reason to take all permissible safety precautions. When the officers boarded the vessel, Officer Brookins accompanied the captain to look for the SUNDANCER's documents while Officer Carlin began to inspect the vessel. During his inspection of the pilot house, Officer Carlin found an open doorway leading down into the interior of the vessel. Because of a partially closed partition over the top of the doorway, Carlin stooped over and took one or two steps down the stairwell to a position where he was able to ascertain whether there was anyone in the lounge area. Consequently, while Officer Carlin went one or two steps beyond the "topside" inspection permitted by *United States v. Alfrey, supra,* we believe that this limited intrusion into the SUNDANCER'S interior was reasonable under the circumstances here as part of a protective sweep. Assuming *arguendo* that the lounge area was a part of the SUNDANCER'S "private living quarters," we hold that it is reasonable as part of a protective sweep for an officer to look through an open door into the lounge and to take one or two steps down a stairway to view the area which is readily accessible through such an open door.[13]

Appellant admits that in some cases law enforcement officers have a right to make a protective sweep after boarding a vessel. Nevertheless, appellant contends that the discovery of the marijuana was illegal in this case because Officer Carlin had an improper motivation when he stepped onto the stairwell which led to the lounge area. According to appellant, Officer Carlin was looking for contraband rather than attempting to ascertain whether there were any people below who might pose a threat to the safety of the boarding party. However, even if we accept appellant's argument that Officer Carlin's primary purpose was to look for contraband, the record clearly indicates that Officer Carlin also was checking to make sure that there were no additional persons aboard the SUNDANCER.[14] We have previously determined that the lawfulness of the boarding of a vessel is not vitiated by the fact that the officer in charge had mixed purposes, both to make a document and safety check and to search for contraband. *See United States v. Jonas,* 639 F.2d 200, 202–03 (5th Cir. 1981). We see no reason to apply a different standard to an officer's conduct once on board a vessel.[15] In this case, we believe that Officer Carlin had a right to

---

**13.** Cf. *United States v. Freeman,* 579 F.2d 942, 944, 947–48 (5th Cir. 1978) (no constitutional violation when Customs officer, while properly on board vessel, "glanced down through a wide-open door (hatch) to ascertain that no one with weapons was lurking below"). We need not consider whether a different result might be required if Officer Carlin had confronted, and opened, a closed doorway leading to the vessel's interior.

**14.** At the suppression hearing, Officer Carlin stated that he always checks around a vessel after boarding to make sure that the crew is accounted for and that there are no individuals with weapons on board. In this regard, the trial judge noted:

This gentlemen [Officer Carlin] ... did what he regularly does because he is enjoying life to some degree; notwithstanding the work he is in, he wants to stay alive ... [I]n today's world of drug smuggling, a police officer is a little bit nutty if he doesn't look down in the hold to see if there is somebody else crouched down there, because weapons

are on the boats and [were] on this boat, so I don't see anything unreasonable about looking into the hold . . . .

**15.** In *United States v. Alonso,* 673 F.2d 334, 336 (11th Cir. 1982), a panel of this court found it unnecessary to decide whether boarding officers' suspicions of a narcotics violation on a vessel would "taint" actions of the officers while on board the vessel which could be justified on other grounds, such as a documents and safety inspection or, as in this case, a protective sweep. Our decision today resolves that issue in a manner which is consistent with previous authority in this circuit. *See, e.g., United States v. Hillstrom,* 533 F.2d 209, 210–11 (5th Cir. 1976) (prior suspicion of presence of drugs does not taint the validity of a documents and safety inspection), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Willis,* 476 F.Supp. 201, 203 (E.D.La.1979) (fact that searching officer's personal motive was to look for drugs did not render search of hold illegal when Coast Guard had legitimate reasons to enter hold to examine main beam number and to check for illegal

step through the open doorway onto the stairwell leading to the lounge area as part of a protective sweep to insure the boarding party's safety. The fact that Officer Carlin also was looking for contraband does not make his action illegal. Thus, we conclude that Officer Carlin was in a place where he had a right to be when he observed the marijuana.

■ Appellant's second contention, that the plain view doctrine does not apply because Officer Carlin did not immediately recognize that the bales were contraband, is without merit. Law enforcement officers "are not required to ignore the significance of items in plain view even when the full import of the objects cannot be positively ascertained without some examination." *United States v. Roberts,* 619 F.2d 379 (5th Cir. 1980). *See also United States v. Diecidue,* 603 F.2d 535, 559 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 and 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *United States v. Bills,* 555 F.2d 1250 (5th Cir. 1977); *cf. United States v. Marshall,* 672 F.2d 425, 426 (5th Cir. 1982) ("obviousness of the nature of the contents of the packages discovered aboard the vessel in the environment wherein they were discovered equates the discovery of the packages with the discovery of their contents"). In this case, Officer Carlin observed the bales from a position where he had a right to be and

recognized that the bales were characteristic of marijuana. He clearly had a right to examine the bales more closely in order to ascertain whether the bales actually were contraband.

For the foregoing reasons, the judgment of conviction is

AFFIRMED.

fish), *aff'd in part, rev'd in part on other grounds,* 639 F.2d 1335 (5th Cir. 1981). *But see United States v. Ruano,* 647 F.2d 577, 579 n. 5 (5th Cir. 1981) (indicating, possibly in dicta, that the stop of a vessel could not be justified under the documents and safety inspection rationale when the Customs officers' motivation for stopping the vessel was to investigate suspicious circumstances). Moreover, our ruling finds support in decisions of several other federal courts. For example, in *United States v. Arra,* 630 F.2d 836 (1st Cir.1980), the First Circuit upheld the search of a vessel pursuant to the Coast Guard's authority to conduct document and safety inspections even though the appellant argued that the real purpose of the search was to check for contraband. The First Circuit refused to look "into the minds of the officers" because "[a]scertaining the real motivation or suspicions of [law enforcement offi-

cers] would prove intractable." *Id.* at 846. *See also United States v. Demanett,* 629 F.2d 862, 868–69 (3d Cir. 1980) (fact that boarding officers suspected presence of contraband and might have conducted intrusive inspection had they not discovered marijuana in plain view did not invalidate the discovery of marijuana during check of vessel's identification number), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *cf. Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) ("fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action").