UNITED STATES of America, Plaintiff-Appellee,

v.

Eladio ALVAREZ–MENA, Defendant-Appellant.

No. 84–2473
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

July 8, 1985.

E. Dale Robertson, Brownsville, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., Susan L. Yarbrough and James R. Gough, Asst. U.S. Attys., Houston, Tex., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CLARK, Chief Judge, GARWOOD and DAVIS, Circuit Judges.

GARWOOD, Circuit Judge:

This appeal concerns the seizure and search by the U.S. Coast Guard of a stateless vessel on the high seas, and the arrest and subsequent prosecution of her alien crew, for violation of 21 U.S.C. section 955a(a). Appellant, one of the crew members who was neither a citizen nor resident of the United States, moved below to dismiss for lack of subject matter jurisdiction and to suppress evidence allegedly illegally obtained during the high seas search and seizure. The denial of those two motions forms the entire basis of this appeal. We determine that the motions were properly denied, and accordingly affirm.

## FACTS AND PROCEEDINGS BELOW

On the morning of February 4, 1984, the United States Coast Guard cutter DURABLE was patrolling in the Yucatan channel between Mexico and Cuba. This channel is a well-known and recognized route for the transportation of illegal drugs into the United States from South and Central America. At approximately 7:00 a.m., Lieutenant George Wood, operations officer aboard the DURABLE, observed a vessel approximately seventy-five feet in length, heading in a generally northwesterly direction into the Gulf of Mexico. As the DURABLE approached the vessel, Lt. Wood noticed that it was riding low in the water, and that it had a false waterline painted on the hull. No name or home port was visible on the stern; the vessel flew no flag. There were no people visible on deck, nor any fishing gear or equipment. The vessel was equipped with several long-range radio antennas, and numerous fifty-five gallon drums were stacked on the stern. The name "LADY MAR" appeared on the bow and on the pilothouse.

Wood contacted the LADY MAR by VHF radio. The individual who replied identified himself as the navigator. He indicated that the LADY MAR's registration was Honduran, number "453"; that there were five people on board, all Honduran; that their last port of call had been Jamaica; and that the LADY MAR was destined for Tampico, Mexico. He identified the captain as "Jim Howard", and the owner as "John Smith". He claimed that the vessel carried no cargo and was traveling "in ballast".[1] However, Wood noticed that the LADY MAR was traveling low in the bow, instead of on an even keel as she would have were she actually traveling in ballast. Wood was also suspicious of the three-digit registration number, because in his experience international merchant vessels had registration numbers containing from five to eight digits or letters. He requested a verification of the registration number; the response from the LADY MAR was "543." (On a subsequent identification check, "453" was again claimed as the registration number.) During this initial radio contact, and following the LADY MAR's claim to be a Honduran vessel, Wood asked that a Honduran flag be displayed. A crewman appeared on deck and hoisted a Honduran flag on the ship's flagpole, but he attached it upside down.

A plot of the LADY MAR's path after she rounded the Yucatan peninsula showed her to be heading on a course of approximately 295 degrees true, by which she would reach landfall somewhere between Corpus Christi, Texas, and a point just south of the Rio Grande River, contradict-

---

1. That is, using water ballast in order to make the ship ride lower in the water than she would in the absence of cargo, in order to make her more stable and less susceptible to being tossed by heavy seas.

ing the claim that her destination was Tampico.[2] Similarly, her previous course was inconsistent with the assertion that she was outbound from Jamaica. During the morning of February 4, the DURABLE requested by radio teletype that the Drug Enforcement Administration's El Paso Intelligence Center provide any available information on the LADY MAR. The response indicated that the LADY MAR was on a DEA lookout list, suspected of drug smuggling activity.

At approximately 10:30 a.m., the LADY MAR entered Mexican territorial waters, on a southwesterly course, away from its stated destination. The DURABLE remained outside Mexican waters, but continued tracking the LADY MAR, maintaining visual and radar contact.

During the afternoon of February 4, in response to inquiries directed through Coast Guard headquarters, the DURABLE received a communication from Coast Guard regional command indicating that the LADY MAR's claimed registration could not yet be confirmed by the Honduran government. The Honduran government granted the Coast Guard permission to board and search the LADY MAR.

By about 8:00 p.m., the LADY MAR had reentered international waters, and the DURABLE made a second approach, during which Lt. Wood observed someone inside the LADY MAR's pilothouse attempting to hold a blanket or cloth of some kind over the portholes, as if to hide something from view. Ensign Robert Birthisel smelled the odor of marihuana from his position on the bridge wing when the DURABLE was within about thirty-five feet of the LADY MAR. The DURABLE notified the LADY MAR by radio that the Honduran government had granted the Coast Guard permission to board her, whereupon the LADY MAR altered course drastically and again went into Mexican waters. Further radio communications were attempted,

but the LADY MAR's responses were evasive; the same person that had previously identified himself to be the navigator, but now claimed to be the captain, indicated that permission from the Honduran government was not sufficient to permit a boarding while the LADY MAR was in Mexican waters. The DURABLE continued to track and to maintain radar contact with the LADY MAR from outside Mexican waters. During this time Wood observed white objects, which appeared to be papers, being thrown overboard from the LADY MAR; none of these were recovered.

At about 1:00 a.m. on February 5, the LADY MAR again exited Mexican waters, heading on a generally northerly course consistent with her earlier heading of 295 degrees. The DURABLE made a third approach at about 3:00 a.m., approaching the LADY MAR from her stern in darkened condition to avoid being seen. When she was very close, approximately ten yards away, the DURABLE illuminated the LADY MAR with a spotlight. The LADY MAR began making erratic movements in an attempt to evade the DURABLE, which she could not outrun. This continued for from fifteen to thirty minutes, during which time the DURABLE maintained close proximity to her, and sprayed her with water and her pilothouse windows with paint in an attempt to force her to stop. During these maneuvers, the LADY MAR deliberately rammed the DURABLE, creating an approximately ten-inch-by-ten-inch hole in DURABLE's bow.[3] The DURABLE finally threatened to use force if necessary, and ordered the LADY MAR to heave-to for boarding. Eventually, the LADY MAR complied, and her crew were ordered to the bow of the vessel. Fourteen crewmembers assembled, not the five originally indicated.

A seven-member boarding party, including Ensign Birthisel, boarded the LADY

---

**2.** A direct route to Tampico would have required a course heading of 270 degrees true.

**3.** Lt. Wood testified at the pretrial suppression hearing that the LADY MAR came nearly to a

stop, at about idling speed, and that, when she was aimed right at the DURABLE, she started her engines forward, and hit the DURABLE in the bow.

MAR[4] and conducted a "personnel sweep."[5] Birthisel entered the pilothouse of the LADY MAR, and, during a flashlight investigation, he observed in plain view objects in the hold that appeared to be bales of marihuana, visible through an open hatch situated in the space just aft of the pilothouse. He again smelled the heavy odor of marihuana. Upon subsequent inspection and testing, the bales were determined to contain marihuana, some nineteen tons in all.

At no time during radio communications—or at any other time—did any crewmember aboard the LADY MAR claim ownership of the vessel or the cargo. The crewmembers were read their rights and placed under arrest. No registration papers, Honduran or otherwise, were found aboard the LADY MAR.

The United States was subsequently informed by the Honduran government that the LADY MAR was not registered in Honduras. Nor was there evidence that the LADY MAR was registered in any other country. The seizure of the LADY MAR occurred in international waters approximately five hundred to five hundred fifty miles south of Brownsville, Texas.

The fourteen crewmembers arrested aboard the LADY MAR were named in various counts of a six-count indictment, which included charges of conspiracy to possess and possession with intent to distribute approximately nineteen tons of marihuana in violation of 21 U.S.C. section 955a and 955c, and 18 U.S.C. section 2; with conspiracy to make and with making false statements in violation of 18 U.S.C. sections 2, 371, and 1001; and with willfully injuring a vessel of the United States in violation of 18 U.S.C. sections 2 and 1363. Appellant and two other defendants filed a motion to dismiss the indictment, contending that the offenses as alleged did not occur within the criminal jurisdiction of the United States. Each of these also filed a motion to suppress use of the marihuana as evidence, claiming that the search of the LADY MAR violated the Fourth Amendment, and that any evidence seized must therefore be excluded. Appellant neither is nor was a resident or citizen of the United States.

After jury selection, but before trial, appellant, among others, indicated that he wished to plead guilty. Pursuant to a plea bargain agreement, appellant pleaded guilty to a superseding criminal information that charged misprision of felony (possession of marihuana with intent to distribute in violation of section 955a) in violation of 18 U.S.C. section 4, although, pursuant to Fed.R.Crim.P. 11(a)(2) and 11(e)(1)(A), he reserved the right to appeal the court's ruling on his motions to dismiss for lack of jurisdiction and to suppress. The court accepted his plea of guilty, and appellant was sentenced to a three-year term of imprisonment; the original indictment was dismissed. The court denied both of appellant's motions. Appellant timely appealed from these denials.

### THE JURISDICTION QUESTION

Appellant challenges the United States' exercise of criminal jurisdiction under 21 U.S.C. section 955a(a), which provides:

> "It is unlawful for *any person* on board a vessel of the United States, or *on board a vessel subject to the jurisdiction of the United States on the high seas,* to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a

---

**4.** Birthisel could smell the odor of marihuana from the deck of the DURABLE throughout this third encounter. The boarding party circled the LADY MAR twice before actually boarding, and Birthisel again noticed a strong smell of marihuana emanating from the LADY MAR.

**5.** Wood ordered the "personnel sweep", a search of all spaces on the vessel in which any crewmembers might have concealed themselves, instead of the more cursory "security sweep", which is a "general check of all open spaces around to make sure there is no one else on board the vessel and to make sure everything is safe for the boarding party .... [and] the vessel is not sinking on us or anything like that."

controlled substance."[6] (Emphasis added.)

The question raised in this appeal is whether the United States can, under the authority of this statute, properly exercise its criminal jurisdiction over a non-resident alien who, on a stateless vessel in international waters, possesses marihuana with intent to distribute it. The district court found that the LADY MAR was a stateless vessel. This finding is not challenged on appeal.[7] Rather, appellant seeks to impose the requirement of a nexus, of the same character as would be required under international law respecting a foreign nation's vessel on the high seas, between the activities in which the LADY MAR was engaged and the United States in order to properly predicate the exercise of United States criminal jurisdiction over an alien's activity aboard the vessel.

■■■ Appellant misreads the statute. Nothing in the act imposes such a nexus requirement. The language of the statute itself indicates unequivocally that jurisdiction is extended to stateless vessels: The term "vessel subject to the jurisdiction of the United States" employed in section 955a(a) is defined in the act to include "a vessel without nationality or a vessel assimilated to a vessel without nationality."[8]

21 U.S.C. § 955b(d). *See also United States v. Howard-Arias*, 679 F.2d 363, 369–71 (4th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982); *United States v. Marino-Garcia*, 679 F.2d 1373, 1379 & n. 10 (11th Cir.1982), *cert. denied*, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983). Nor is there any doubt that Congress intended that subsection (a) would apply on the high seas, for its coverage of conduct on stateless vessels is expressly with reference to those "on the high seas." Moreover, subsection (h) of section 955a provides: "This section [955a] is intended to reach acts of possession, manufacture, or distribution committed outside the territorial jurisdiction of the United States."

■■■ The legislative history of 21 U.S.C. sections 955a–955d indicates that Congress contemplated that these provisions would extend jurisdiction to the "maximum ... permitted under international law." S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin. News 1980, pp. 2785, 2786; *see also* H.R. Rep. No. 323, 96th Cong. 1st Sess. 11 (1979); *United States v. Pinto-Mejia*, 720 F.2d 248, 259–60 (2d Cir.1983); *United States v. Marino-Garcia*, 679 F.2d at 1379;

---

6. Subsections (b), (c), (d) and (h) of section 955a provide as follows (emphasis added):

"(b) It is unlawful for *a citizen of the United States* on board *any vessel* to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

"(c) It is unlawful for *any person on board any vessel within the customs waters of the United States* to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.

"(d) It is unlawful for *any person* to possess, manufacture, or distribute a controlled substance—

"(1) intending that it be unlawfully imported into the United States; or

"(2) knowing that it will be unlawfully imported into the United States.

" ...

"(h) This section is intended to reach acts of possession, manufacture, or distribution committed *outside the territorial jurisdiction of the United States.*"

7. We note that the Honduran government issued a certificate of non-registration for the LADY MAR. Such certificates have been held to be satisfactory proof of statelessness. *E.g.*, *United States v. Howard-Arias*, 679 F.2d 363, 366–67 (4th Cir.), *cert. denied*, 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982); *but cf. United States v. Pinto-Mejia*, 720 F.2d 248, 256–58 (2d Cir.1983).

8. A vessel falsely claiming a nationality, or one which claims more than one nationality, is deemed to be stateless; *i.e.*, a vessel assimilated to a vessel without nationality. *See, e.g.*, Convention on the High Seas, 13 U.S.T. 2312, T.I.A.S. No. 5200, Art. 6, ¶ 2 (1958) (effective September 30, 1962); *United States v. Pinto-Mejia*, 720 F.2d 248, 252–53 (2d Cir.1983); *United States v. Marino-Garcia*, 679 F.2d 1373, 1379 & n. 10 (11th Cir.1982), *cert. denied*, 459 U.S. 1114, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); *United States v. Dominguez*, 604 F.2d 304 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980).

1980 U.S.Code Cong. & Admin.News 2785.[9] Appellant argues that international law requires proof of an intent to distribute the marihuana in the United States in order to properly confer jurisdiction. We reject this contention. A requirement of knowledge or intent respecting importation into the United States is expressly imposed in subsection (d) of section 955a. However, no such requirement is present in subsection (a) of section 955a, although subsection (a), unlike subsection (d), does require that the offense occur on a vessel of the United States or a stateless vessel on the high seas. Stateless vessels on the high seas enjoy little, if any, protection under international law. *United States v. Howard-Arias,* 679 F.2d at 371; *United States v. Rubies,* 612 F.2d 397, 403 (9th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); *United States v. Cortes,* 588 F.2d 106, 110 (5th Cir.1979). The right to navigate on the high seas is accorded equally to all nations. *See* Convention on the High Seas, 13 U.S.T. 2312, T.I.A.S. No. 5200, Art. 2 (1958) (effective September 30, 1962). With that right, however, goes concomitant responsibility to respect the similar rights of other nations (the "principle of noninterference", *see United States v. Williams,* 617 F.2d 1063, 1081 (5th Cir.1980) (en banc)). To give effect to and to enforce this reciprocal relationship, the Convention provides that a ship has the nationality of the country whose flag she flies, and comes therefore under the exclusive jurisdiction of that state when she is on the high seas. Convention, Arts. 5, 6. Article 6 of the Convention provides expressly that a ship may sail under the flag of only one state, that she may not change flags during a voyage except in cases of actual change of registration or of ownership, and that sailing under more than one flag means that the ship be considered to be without nationality. We agree with the conclusion of the Second Circuit:

> "The suggestion underlying these principles is that a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity." *United States v. Pinto-Mejia,* 720 F.2d at 260.

*See also United States v. Smith,* 680 F.2d 255, 258 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *United States v. Marino-Garcia,* 679 F.2d at 1382–83. "[I]nternational law shelters only members of the international community of nations from unlawful boarding and searches on the high seas." *United States v. Cortes,* 588 F.2d at 110; *cf. United States v. Williams,* 617 F.2d at 1082. The exercise of jurisdiction over the stateless vessel LADY MAR in this instance, therefore, is authorized by the plain language of the statute, is consistent with the clear intent of Congress, and does not offend traditional principles of international law. No showing of nexus or knowledge or intent is required where jurisdiction is predicated on the stateless status of the vessel on the high seas.[10]

■ Appellant maintains that, even if jurisdiction was properly exercised over the LADY MAR *in rem* by virtue of her state-

---

**9.** The constitutional power to proscribe and punish offenses committed on the high seas is reflected in Article I, section 8, clause 10, and in Article III, section 2, of the Constitution. See *United States v. Smith,* 680 F.2d 255, 257 (1st Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).

**10.** We note in this context that the Eleventh Circuit has suggested that the Congress ought perhaps to have included drug trafficking in the same category of universally condemned and outlawed activities as piracy or the slave trade, making it, therefore, actionable by any nation as against *any* vessel on the high seas. *United States v. Marino-Garcia,* 679 F.2d at 1382 n. 16. Congress has not chosen to do so by this act, however, and the Single Convention on Narcotic Drugs, 18 U.S.T. section 1407 (1962), which would do so, and to which the United States is a signatory, has not yet been placed into force because of lack of the requisite number of ratifying nations. *See United States v. Marino-Garcia,* 679 F.2d at 1382 n. 16.

less status, it was nonetheless improper to assert jurisdiction over the shipboard activities of the members of her crew, who, though neither residents nor citizens of the United States, were not stateless *persons*. Appellant does not maintain that the LADY MAR was not stateless. Because members of the crew of a stateless vessel on the high seas have no basis on which to assert any claim to the jurisdictional exemptions of international law that are unavailable to the vessel upon which they sail, however, appellant has no valid claim to immunity from the proper exercise of the United States' criminal jurisdiction over his actions aboard the stateless vessel LADY MAR on the high seas. *See United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc). Congress clearly intended such a result, as indicated by the plain language of subsection (a) of section 955a, which extends criminal culpability to *"any person ... on board a vessel subject to the jurisdiction of the United States on the high seas."* (Emphasis added). Further, the "any person" language of subsection (a) is to be contrasted to the "a citizen of the United States" provision in subsection (b), the latter subsection, however, unlike subsection (a), not imposing any requirement as to the United States nationality or statelessness of the vessel. Plainly, the basis for jurisdiction in subsection (a) is not the citizenship of the person as in subsection (b) (nor that there be known or intended United States consequences, as in subsection (d), which has no vessel or personal citizenship requirement), but is rather solely the "citizenship" of the vessel and, in the case of a stateless vessel, its presence on the high seas.

■ Moreover, as we have already indicated, Congress anticipated that the act would reach as far as international law would countenance. "[A]ny person" as used in subsection (a) applies equally and without differentiation to those on board "a vessel of the United States" and to those on board a stateless vessel on the high seas. It is clearly established that international law requires no citizenship (or nexus) requirement in order for a nation to extend the reach of its criminal laws to conduct on vessels of its own flag. *See United States v. Flores*, 289 U.S. 137, 53 S.Ct. 580, 582–86, 77 L.Ed. 1086 (1933); *Marino-Garcia*, 679 F.2d at 1380 n. 12; *United States v. Del Sol*, 679 F.2d 216, 217 (11th Cir.1982); *United States v. Riker*, 670 F.2d 987, 988 (11th Cir.1982); *United States v. Liles*, 670 F.2d 989, 990 n. 2, 992 (11th Cir.), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). We have also noted that international law does not preclude any nation from exercising jurisdiction over stateless vessels on the high seas. Accordingly, subsection (a)'s "any person" is plainly not restricted to persons of United States residence or citizenship, or to persons having knowledge of or an intent to effect a result in the United States. *See also United States v. Pinto-Mejia*, 720 F.2d at 259–60; *United States v. Howard-Arias*, 679 F.2d at 370–71.

Finally, given the clear authority of Congress in the premises, *see* note 9, *supra,* the relevance of international law to the problem at hand is as a reflection of Congressional intent rather than as a limitation on the power of Congress, at least where, as here, there is no basis for any claim of due process violation. *See United States v. Pinto-Mejia*, 720 F.2d at 259; *United States v. Howard-Arias*, 679 F.2d at 371. Here the legislative history and the wording of the statute clearly demonstrate Congress's intent to proscribe the specified conduct of "any person" on a stateless vessel on the high seas without any United States nexus or personal citizenship requirement, as well as Congress's awareness of the well established rule of international law that stateless vessels on the high seas may be subjected to the jurisdiction of any nation. In this situation, in order for us to find that Congress, out of deference to international law, nevertheless did intend for there to be some such requirement for a United States nexus or personal citi-

zenship as to persons on stateless vessels on the high seas, there would have to be a broadly established and well recognized principle of international law clearly specifying that the right of nations to subject stateless vessels on the high seas to their jurisdiction is exclusive of the right to exercise jurisdiction over the conduct of those aboard such vessels and that jurisdiction over the conduct of such persons extends no farther than it would if they were on foreign flag vessels. However, there is no such principle.[11]

As the LADY MAR was a stateless vessel on the high seas, appellant's possession thereon of marihuana with intent to distrib-

ute was within the proscription of section 955a(a), notwithstanding that appellant was an alien and without regard to whether the marihuana was destined for the United States or whether appellant so knew or intended. We therefore conclude that the district court properly denied the motion to dismiss for lack of subject matter jurisdiction.

## THE SEIZURE AND SEARCH QUESTION

Appellant asserts that the Coast Guard seizure and search of the LADY MAR was illegal and that, therefore, the marihuana obtained as evidence following the search

---

**11.** This Court has on several previous occasions held that the objective territorial principle of international law provides a proper basis for the assertion of jurisdiction over extraterritorial criminal acts committed on *foreign flag* vessels, provided an appropriate nexus is shown between the acts and the United States. *E.g., United States v. Loalza-Vasquez,* 735 F.2d 153, 156 (5th Cir.1984); *United States v. Gray,* 659 F.2d 1296, 1298 (5th Cir.1981); *United States v. DeWeese,* 632 F.2d 1267, 1271 (5th Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1980). The required nexus may be shown by demonstrating that a sufficient effect occurs within the United States as a result of the illicit activity, or by demonstrating an intent that the illegal activity have such an effect, or knowledge that it will. *See, e.g., United States v. Loalza-Vasquez,* 735 F.2d at 156; *United States v. Gray,* 659 F.2d at 1298; *United States v. Rivard,* 375 F.2d 882, 885–86 (5th Cir.), *cert. denied sub nom. Groleau v. United States,* 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967).

But here we do not deal with a foreign flag vessel. Section 955a(a) relates only to vessels of the United States and stateless vessels on the high seas, and, as we have noted, it imposes no nexus requirement. Nevertheless, we observe that we are not faced with a situation where the interests of the United States are not even arguably potentially implicated. The present case is not remotely comparable to, for example, the case of an unregistered small ship owned and manned by Tanzanians sailing from that nation to Kenya on which a crew member carries a pound of marihuana to give a relative for his personal consumption in the latter country. It might be inferred that Congress did not intend to reach so far in section 955a(a) as to cover such a hypothetical case. The validity of such an inference, however, is by no means entirely clear. *See* note 10, *supra; United States v. Marino-Garcia,* 679 F.2d at 1379.

Given the quantity of marihuana aboard the LADY MAR, its course heading towards the United States, the fact that its route was one frequently used by those bringing marihuana into the United States from South America, and its suspicious outfitting and behavior, culminating with the ramming of the Coast Guard cutter, it is at least arguable that there was sufficient evidence of an intent to import into the United States. *See United States v. Loalza-Vasquez,* 735 F.2d at 156.

We also observe that marihuana is not generally smuggled into Mexico, and that indeed Mexico is an exporter thereof to the United States. *See United States v. Freeman,* 660 F.2d 1030, 1033–34 (5th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982).

There is in any event no doubt that those on board the LADY MAR were engaged in precisely the kind of illicit activity that Congress intended section 955a(a) to reach. We think it clear that by section 955a Congress intended, at a minimum, a broad prophylactic means by which to interdict or disrupt the general kind of maritime drug traffic, whether or not by United States citizens, that had the apparent potential for eventually culminating, directly or indirectly, in importation of drugs into the United States, without the necessity of proving that the *particular* shipment was in fact destined for the United States or that this was actually known or intended by the *particular* defendant on board. The only relevant exception to this was in the situation of foreign nationals on foreign flag vessels not within the customs waters of the United States, where the referenced knowledge or intent in the particular case was required, plainly out of deference to the flag nation's otherwise exclusive jurisdiction under international law in such instances.

ought to have been suppressed. We reject this contention.

■ The Coast Guard is authorized under 14 U.S.C. section 89(a) to stop and to search any vessel "subject to the jurisdiction, or to the operation of any law, of the United States," even beyond the United States' twelve-mile territorial and contiguous zone limit, subject only to the restriction that foreign vessels may not be unreasonably interfered with. *See United States v. Williams*, 617 F.2d 1063, 1073 n. 6 (5th Cir.1980) (en banc); *cf.* Convention on the High Seas, 13 U.S.T. 2312, T.I.A.S. No. 5200, Art. 22 (1958) (in force as of September 30, 1962). The Coast Guard need have only a "reasonable suspicion" that a vessel is subject to United States law before effecting a seizure of the vessel in international waters. *United States v. Williams*, 617 F.2d at 1074, 1076.

■ The circumstances under which the Coast Guard seized the stateless vessel LADY MAR form the basis for at least a reasonable suspicion that she was engaged in narcotics or smuggling activity in contravention of United States law, in particular, in violation of section 955a. The LADY MAR flew no flag, and had no stern markings indicating home port or country. She rode low in the water, especially at the bow, in contradiction of the assertion by one of her crew that she rode in ballast, and she had a false waterline painted in order to further the "no cargo" deception. She engaged in obviously evasive maneuvers and course changes. Her radio communications with DURABLE evinced similar evasiveness. She claimed Honduran registry, which a routine inquiry to that government failed to verify; she provided suspicious—and varying—registration numbers; and, when requested by the Coast Guard to display her flag, she flew the Honduran flag upside down. She carried radio equipment not common to vessels of her size and type, but often utilized by drug smugglers. Extra fuel drums indicated that she was prepared for a long trip. She was on a course that would likely take her to the southern Gulf Coast of Texas, along a route known to be frequented by drug smugglers. She was on a DEA list of vessels suspected of being involved in illicit drug trafficking. In short, we would be hard pressed to imagine more appropriate circumstances to arouse a reasonable suspicion that those on board were in violation of section 955a and, indeed, that the LADY MAR was taking contraband to the United States. We note that the desperate, evasive maneuvers effected by the crew of the vessel upon being hailed by the Coast Guard and told to heave-to, culminating with the intentional ramming of the cutter, were alone sufficient to verify and render reasonable any otherwise unjustified suspicions the crew of the DURABLE may have entertained as a result of previous encounters with the LADY MAR. Finally, we note that the nation of claimed registry had given permission for the Coast Guard to stop and board the LADY MAR. *See United States v. Williams*, 617 F.2d at 1077.[12]

■ The subsequent search of the vessel is itself justified on several grounds. The Coast Guard boarding party could legally engage in a "topside" search of the vessel to ensure that there were not additional crew secreted on board, who might prove a danger to either the boarding party or,

12. We note also in this context that international law recognizes a "right of approach," which provides that a warship of one sovereign "may proceed to verify the [other foreign] ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship...." Convention on the High Seas, 13 U.S.T. 2312, Art. 22 (1958). The right to seize a vessel under this doctrine "does not necessarily hinge on there being any suspicion of criminal activity," *United States v. Williams*, 617 F.2d at 1082, and may be justified and reasonable where there is a "'justifiable suspicion that the [seized vessel] was attempting to conceal its identity and activities.'" *Id.* (quoting *United States v. Cortes*, 588 F.2d 106, 110–11 (5th Cir.1979)).

indeed, to the cutter DURABLE herself. *United States v. Alfrey*, 620 F.2d 551, 555 (5th Cir.), *cert. denied*, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980); *United States v. Kent*, 691 F.2d 1376, 1382 (11th Cir.1982), *cert. denied*, 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983); *cf. United States v. Freeman*, 579 F.2d 942, 944, 947–48 (5th Cir.1978). Once aboard, the Coast Guard had the authority to act upon suspicions aroused during and prior to the boarding. *United States v. Martinez*, 700 F.2d 1358, 1361 (11th Cir.1983); *United States v. Postal*, 589 F.2d 862 at 889 (5th Cir.1979); *cf. United States v. Kent*, 691 F.2d at 1383 ("lawfulness of the boarding of a vessel is not vitiated by the fact that the officer in charge had mixed purposes, both to make a document and safety check and to search for contraband.") (citing *United States v. Jonas*, 639 F.2d 200, 202–03 (5th Cir.1981)); *id.* at 1383 n. 15. The marihuana was discovered in plain view during the course of a subsequent maritime search of the vessel, and, in any event, the distinctive odor of the contraband weed apparently was ubiquitous and easily detected by olfaction on board and well beyond the LADY MAR, even over strong diesel fumes, 'as Ensign Birthisel testified. *See also United States v. Kent*, 691 F.2d at 1382. We note additionally that "[t]he terms of section 89(a) impose no restrictions on the search of any vessel that has been seized pursuant to [that] statute. Therefore, section 89(a) also authorized the search...." *United States v. Williams*, 617 F.2d at 1075.

■ Moreover, appellant, merely a crewman of the vessel, lacks standing to assert any privacy interest in the LADY MAR's hold where the marihuana was discovered. *United States v. Williams*, 617 F.2d at 1084; *see also United States v. Pinto-Mejia*, 720 F.2d at 255. Appellant asserts no ownership or other proprietary interest either in the vessel or in its cargo, and the circumstances of the living conditions and layout of the LADY MAR [13] leave little room for any contention that appellant had any reasonable expectation of privacy in the portion of the vessel where the marihuana was found in plain view. *United States v. Kent*, 691 F.2d at 1382; *United States v. Williams*, 617 F.2d at 1088; *United States v. Cortes*, 588 F.2d at 111. Even if there had been a reasonable possibility of such privacy interests, because an identity check situation generally authorizes the Coast Guard's entry of a ship's hold in order to verify her identity, "no one, not even a person with a proprietary interest in the vessel and in the cargo, could conceivably have any legitimate expectation of privacy with regard to any objects that would be in the plain view (or smell) of a person conducting such an identification check." *Williams*, 617 F.2d at 1086.

### CONCLUSION

The district court's denial of appellant's motions to dismiss for lack of subject matter jurisdiction and to suppress evidence were correct and are sustained. As the appeal presents no other issues, the conviction and sentence are affirmed.

AFFIRMED.

---

**13.** The marihuana was stored in the engine room hold, accessible by an open hatch in the crew's communal living quarters, themselves immediately aft of the vessel's pilothouse and accessible therefrom. Some of the over 500 bales of marihuana were visible to Ensign Birthisel through the open hatchway upon a simple flashlight sweep investigation from the pilothouse.