**UNITED STATES of America, Plaintiff-Appellee,**

v.

Gsaac Gorge PINTO–MEJIA, Orlando Espinosa Sanchez, Jorge Eliecer Cordoba-Lezcano, Luis Ancizar Castenad-Garjales, Luis Alfonso Barker-Michel, Carlos Osorio-Alvarez, Luis Francisco Mayorga, Jose Felix Angulo-Quinones, Roberto Nunez-Riasco, Blas Enrique Vargas-Rios, Euclidez Vello-Garcia, Defendants-Appellants.

Nos. 1189, 1213, 1194, 1190, 1203, 1191, 1162, 1193, 1192, 1204 and 1195, Dockets 82–1412 to 82–1417, 82–1421 to 82–1424 and 82–1433.

United States Court of Appeals, Second Circuit.

Argued April 26, 1983.

Decided Oct. 14, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc Feb. 15, 1984.*

**250**

John N. Villios, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y., on brief), for plaintiff-appellee.

Lawrence Hilliard Levner, New York City, for defendant-appellant Pinto-Mejia.

Edward J. Quinn, Brooklyn, N.Y., for defendant-appellant Sanchez.

Michael F. Grossman, New York City, for defendant-appellant Cordoba-Lezcano.

Allen Lashley, Brooklyn, N.Y., for defendant-appellant Castenad-Garjales.

Lawrence J. Gross, Elmhurst, N.Y., for defendant-appellant Barker-Michel.

Richard I. Rosenkranz, Brooklyn, N.Y., for defendant-appellant Osorio-Alvarez.

Joel B. Rudin, New York City (Rudin & Levitt, New York City, on brief), for defendant-appellant Mayorga.

Raphael F. Scotto, Brooklyn, N.Y., for defendant-appellant Angulo-Quinones.

Robert A. Ugelow, Brooklyn, N.Y., for defendant-appellant Nunez-Riasco.

Phylis Skloot Bamberger, New York City (The Legal Aid Society, Federal Defender Services Unit, New York, on brief), for defendant-appellant Vargas-Rios.

Philip Katowitz, Brooklyn, N.Y., for defendant-appellant Vello-Garcia.

Before KEARSE, PIERCE and PECK,[*] Circuit Judges.

KEARSE, Circuit Judge:

Defendant Gsaac Gorge Pinto-Mejia and ten codefendants appeal from judgments entered in the United States District Court for the Eastern District of New York, Henry Bramwell, *Judge,* convicting them of one count of possessing with intent to distribute approximately twenty tons of marijuana on board a vessel subject to the jurisdiction of the United States on the high seas, in violation of 21 U.S.C. § 955a(a) (Supp. V 1981). The judgments were entered following defendants' agreement, consented to by the government and the court, to plead guilty on that count on the condition that they be allowed to challenge on appeal the lawfulness of the seizure by the United States Coast Guard of the marijuana from the hold of the vessel.[1]  The defendants contend

* Honorable John W. Peck, of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

1. Defendants Mayorga, Angulo-Quinones, Vargas-Rios, Barker-Michel, Nunez-Riasco, Espinosa Sanchez, and Osorio-Alvarez each received sentences of imprisonment of four years and nine months and special parole terms of ten years. They are currently incarcerated. Defendants Cordoba-Lezcano, Castenad-Garjales, Pinto-Mejia, Vello-Garcia, and Cuevas-Viatela each received sentences of imprisonment of four years and special parole terms of five years, with six months of the sentences to be served and the remainder suspended; each of these defendants was placed on probation for five years. These defendants have served their prison terms.

here that the judgments should be reversed and the indictment dismissed because (1) the vessel was not subject to the jurisdiction of the United States, and hence the district court lacked subject matter jurisdiction, and (2) the Coast Guard's boarding, search, and seizure of the vessel violated defendants' rights under the Fourth Amendment to the Constitution. Although we find no merit in the second ground, we conclude that a question remains as to the jurisdictional ground and we remand for further proceedings.

## I. BACKGROUND

Pinto-Mejia and his codefendants are Colombian nationals who were members of the crew of the RICARDO, a vessel intercepted by the Coast Guard on the high seas, some 200 miles off the point of Montauk. Most of the material facts as to the interception, presented to the district court largely through affidavits and testimony at a suppression hearing, are undisputed.

### A. *The Interception, Boarding, and Search of the RICARDO*

On June 26, 1982, the Coast Guard cutter DUANE, an ocean-going ship, was engaged in a cadet training cruise and a routine law enforcement patrol in an area approximately 100 miles southeast of Nantucket, Massachusetts. At approximately 8:10 a.m., deck officer Ensign Thomas Willis detected by radar a vessel headed on a southwesterly course toward the United States mainland. The course of the DUANE was then altered so that the vessel could be intercepted and its identity determined. At about 9:15 a.m., Willis sighted the vessel through high-powered binoculars from a distance of about seven miles and observed that it appeared to be a fishing boat some 70 to 80 feet long, traveling at a speed of about 9 knots. The vessel, which was not flying a flag, was then on a southeasterly course headed away from the mainland. As the DUANE drew closer to the fishing boat, Willis noticed

that the name "RICARDO" was crudely painted on the stern of the boat, that there was a large quantity of running rust on the hull, that the boat's block and tackle were in a state of disrepair, and that the RICARDO carried no fishing gear such as would normally be carried by an active fishing vessel. Willis also noted that the waterline on the RICARDO appeared to be freshly painted and to be higher than the level of the boat's natural waterline. Based on these observations and his Coast Guard experience with other vessels exhibiting similar characteristics, Willis concluded that the RICARDO might be smuggling narcotics. A check of the DUANE's computer revealed that on April 29, 1982, the RICARDO had been seen in Barranquilla, Colombia, a known drug exporting port.

As the DUANE approached the RICARDO, the Coast Guard attempted to contact the RICARDO by radio, by the ship's public address system, and by bullhorn in both Spanish and English, requesting that the RICARDO call the DUANE by radio. No response was received, but a half-hour later a member of the RICARDO's crew raised a Venezuelan flag. The Coast Guard continued its requests for radio contact and broadcast a message that the DUANE was attempting to contact the Venezuelan government for permission to board the RICARDO.

During the afternoon of June 26, as the DUANE followed the RICARDO at a distance of some 200 to 300 yards, Lieutenant Thomas Haas, the officer in charge of cadet training, detected from his position on the deck of the DUANE the odor of marijuana drifting back from the RICARDO.[2] Haas testified, without objection from the defendants, that the operations officer and commanding officer also had smelled the odor of marijuana.

The DUANE continued to follow the RICARDO and to try to establish communication with it throughout June 26 and on June 27. On the afternoon of June 27, the

---

**2.** Haas, a Coast Guard Academy chemistry instructor, had previously participated in a seizure of a smuggling vessel during which he had

experienced the odor of a large quantity of marijuana.

Coast Guard repeatedly sought permission to board the RICARDO, and eventually one of the crew members of the RICARDO came onto the deck and directed a thumbs-up signal toward the DUANE, which the Coast Guard interpreted as permission to board.[3] Following the thumbs-up signal, the Coast Guard broadcast a request that the RICARDO stop, which it promptly did. Five Coast Guardsmen boarded the RICARDO, with Ensign Willis in charge. Consistent with Coast Guard policy, all members of the boarding party were armed, but their weapons were neither aimed at the RICARDO's crew nor carried in such a manner as to give the impression that force was being used.

Once on board the RICARDO, Willis was informed[4] by one member of the crew, later identified as defendant Roberto Nunez-Riasco, that the captain of the RICARDO had sailed away in a small boat three days earlier, seeking food and water, and had taken the RICARDO's registration papers and other documentation with him. Nunez-Riasco stated that he did not know from where the RICARDO was coming or where it was going, and that the captain had told the crew to steer a 180-degree course until he returned. Willis requested and received from Nunez-Riasco permission to look around the vessel and to open its compartments. Willis and members of the boarding party then opened the main hold and discovered what turned out to be approximately 20 tons of marijuana. Upon searching the rest of the vessel, Willis found, among other things, four flags under a mattress, including flags of Ecuador and the Domini-can Republic. A crew member stated that the boat was of Venezuelan nationality.

Notwithstanding discovery of the marijuana, the Coast Guard informed the RICARDO's crewmen that they were not under arrest, that the Coast Guardsmen were guests on board, and that the crewmen need not accede to requests by the Coast Guardsmen. A member of the crew gave permission for the Coast Guard to pilot the RICARDO in a northwesterly direction. Eventually, on June 28 at about 7:00 p.m., the crewmen were informed that they were under arrest by authority of the United States government.

B. *The Indictment and the Ensuing Proceedings*

Each member of the RICARDO's crew was charged in a two-count indictment with violating 21 U.S.C. § 955a(a) and with conspiring to violate that provision, in violation of 21 U.S.C. § 955c. Section 955a(a) makes it unlawful for "any person on board a . . . vessel subject to the jurisdiction of the United States on the high seas" to possess a controlled substance with the intent to manufacture or distribute it. In 21 U.S.C. § 955b(d), "vessel subject to the jurisdiction of the United States" is defined to "include[ ] a vessel without nationality or a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the Convention on the High Seas, 1958." Article 6 of the Convention on the High Seas, *opened for signature* April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 5200

---

3. The Coast Guard's attempts to communicate with the crew of the RICARDO had been conveyed by Cadet Mary Dillman, who, among those aboard the DUANE, was apparently thought to be the most proficient in Spanish. According to the suppression hearing testimony of Haas, Dillman's request to the RICARDO that the Coast Guard be permitted to board the RICARDO consisted of the Spanish phrase "Permision embarque tu barco." The defendants called as a witness a free-lance interpreter who testified that the word "embarcar"—the infinitive form of "embarque"—means to ship, not to board, and that the phrase to which Haas testified is not properly translated as requesting permission to board a ship but rather is the garbled phrase "permission ship your ship." In rebuttal, Dillman testified that in fact the phrase she had used was "permision para embajar a su barco." In response, the defendants called as a witness the court's official interpreter, who testified that in Spanish there is no such word as "embajar." The official interpreter also confirmed that the word "embarcar" means to ship rather than to board.

4. Willis was assisted off and on in the conversations by Dillman, who was not a member of the original boarding party but was intermittently on board the RICARDO, or in radio contact, as her interpreting services were needed.

("Convention on the High Seas"), provides as follows:

> Article 6: 1. Ships shall sail under the flag of one State only and, save in exceptional cases expressly provided for in international treaties or in these articles, shall be subject to its exclusive jurisdiction on the high seas. A ship may not change its flag during a voyage or while in a port of call, save in the case of a real transfer of ownership or change of registry.
>
> 2. A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality.

Eight defendants promptly moved to dismiss the indictment on the ground that the RICARDO was not subject to the jurisdiction of the United States. All defendants moved to suppress, *inter alia,* the marijuana seized from the RICARDO on the ground that the Coast Guard's boarding, search, and seizure had violated their Fourth Amendment rights.

### 1. *The Denial of the Jurisdictional Motions*

Prior to holding an evidentiary hearing, the district court, after hearing argument and considering the above events as described in the parties' papers, denied defendants' motion to dismiss for lack of subject matter jurisdiction. The court found that (1) when first observed by the Coast Guard, the RICARDO was flying no flag and was headed toward the United States mainland; (2) the RICARDO changed course away from the mainland and hoisted a Venezuelan flag as the DUANE neared; (3) the RICARDO was found to be carrying flags of several other states; and (4) although the RICARDO claimed Venezuelan nationality, its registration with that country had expired more than two years before the seizure occurred. On the basis of these findings, the court ruled that the RICARDO was a vessel subject to the jurisdiction of the United States because "at the very least, . . . when seized, [it] was a vessel 'assimilated to a stateless vessel,' and at best, . . . was a vessel without nationality." (Sept. 30, 1982 Transcript ("9/30 Tr.") at 30.)

For its finding that the RICARDO's registration had expired, the court initially relied on the government's assertion in its brief that it had obtained a certificate from the Venezuelan Ministry of Transportation and Communications, Bureau of Maritime Transportation and Traffic (the "Certificate"), stating that the RICARDO had been registered in Venezuela, but that the registration had expired as of May 21, 1980, and no record of a renewal or reinstatement could be found. Some weeks later, at the evidentiary hearing on defendants' motions to suppress, the government offered in evidence the Venezuelan Certificate itself. The Certificate, which is set out in full in the margin,[5] stated in part that the RICAR-

---

**5.** The certificate, as translated by an official court interpreter and as admitted into evidence by the district court, reads as follows:

Republic of Venezuela—Ministry of Transportation and Communications—Bureau of Maritime Transportation and Traffic

OFFICE OF THE DIRECTOR GENERAL No. W/O No.—

CERTIFICATION

The undersigned, District Director General of Water Transportation, appointed pursuant to Resolution No. 1.091 of the Ministry of Transportation and Communications dated September 1, 1981, as published in Official Journal No. 32.304 dated September 2, 1981, exercising the attributes conferred upon him by law, hereby certifies for all such purposes as may be deemed appropriate, that the mo-

tor boat under the name of "Ricardo", registration AMMT–1.060, numeral YYP–2083, registered with the Harbor Master's Office of Las Piedras, Falcon State, as confirmed by the Office of Harbor Masters of the Republic by telegraph communication of the present month of July, evidently sailed clandestinely from Venequelan [*sic*] port and the last time it was heard from was on May 21, 1979, when it registered a change of ownership at the Branch Registry of Punto Fijo, Carirubana District of Falcon State, as was duly entered in the appropriate register book of the Harbor Master's Office for that jurisdiction. Therefore, failing to have any further news from it since that date, May 21, 1979, the Maritime Authority has found grounds for the expiration of its registration pursuant to

DO had been registered in Venezuela; that it had "evidently sailed clandestinely" from a Venezuelan port and had last been heard from on May 21, 1979; and that "failing to have any further news from it since that date, May 21, 1979, the Maritime Authority has found grounds for the expiration of its registration . . . ." The Certificate concluded as follows:

> Therefore, the motor boat "Ricardo", originally registered in the Harbor Master's Office of Las Piedras, in view of the expiration of its registration, as of May 21, 1980, could not invoke the Venezuelan nationality to protect its status under any circumstance, particularly in situations involving a crime or infraction.
>
> Reinstatement to its status of Venezuelan vessel after the said date (May 21, 1980) would have required the renewal of its documents, after justifying its absence and receiving a favorable decision from the Venezuelan authorities, something that did not ever take place.

Defendants objected to the introduction of the Certificate under Fed.R.Evid. 803(10), which permits receipt of an appropriate certification of the absence of a public record; their argument was cut short, however, by the government's disclaimer of reliance on Rule 803(10) and its invocation instead of Rule 803(8), which governs existing public records. The court agreed that the Certificate did not show an absence of a record, and it admitted the document into evidence over defendants' objections that admission was not authorized by Rule 803(8) and would violate their rights of confrontation under the Sixth Amendment to the Constitution.

In a ruling announced on October 20, 1982, the court stated that it had considered the Venezuelan Certificate and confirmed its September 30, 1982 finding that the RICARDO was a stateless vessel at the time of its seizure. Accordingly, the court adhered to its decision denying defendants' motion to dismiss the indictment for lack of jurisdiction.

### 2. The Denial of the Suppression Motions

Following the evidentiary hearing, the district court denied defendants' motions to suppress the marijuana seized from the RICARDO. The court ruled that, in all the circumstances set forth above, the Coast Guard's stopping, boarding, and search of the RICARDO were based upon a reasonable suspicion that the vessel was engaged in narcotics smuggling. In addition, the court held that defendants had voluntarily consented to the stopping, boarding, and search.

### 3. The Conditional Pleas of Guilty

Following these rulings, each defendant entered a conditional plea of guilty to one count of violation of § 955a(a), and the government agreed to the dismissal of the conspiracy count. With the approval of the court, the parties stipulated that defendants reserved their right to appeal the "lawfulness of the Coast Guard's seizure of" the marijuana.

---

the stipulations set forth in Section 5 of Article 22 of the Navigation Law.

The said vessel held a Sailing License which authorizes any Venezuelan ship (Art. 19 of the Navigation Law) to sail only between national ports and between them and the Greater and Lesser Antilles, including the Dominican Republic and Haiti, the Guianas, and the Colombian ports of the Atlantic.

Therefore, the motor boat "Ricardo", originally registered in the Harbor Master's Office of Las Piedras, in view of the expiration of its registration, as of May 21, 1980, could not invoke the Venezuelan nationality to protect its status under any circumstance, particularly in situations involving a crime or infraction.

Reinstatement to its status of Venezuelan vessel after the said date (May 21, 1980) would have required the renewal of its documents, after justifying its absence and receiving a favorable decision from the Venezuelan authorities, something that did not ever take place.

> Caracas, July 27, 1982
> (Signature)
> Jose Jesus Villafana Salazar
> Rear Admiral

(There is a rubber stamp that reads: Republic of Venezuela, Ministry of Transportation and Communications, Bureau of Maritime Transportation and Traffic.)

## II. ISSUES PRESERVED FOR APPEAL

On this appeal defendants pursue their contentions that the United States lacks jurisdiction to prosecute them and that the actions of the Coast Guard violated their Fourth Amendment rights.[6] The stipulation pursuant to which the pleas of guilty were entered conditioned those pleas on defendants' being "permitted to reserve and raise only the following issue on appeal from the judgment herein, i.e. the lawfulness of the Coast Guard's seizure of approximately 20 tons of marijuana from the hold of the 'Ricardo' on June 27, 1982." The narrowness of this stipulation creates questions as to whether defendants are entitled to pursue their jurisdictional and constitutional challenges on appeal.

### A.  *The Jurisdictional Question*

In its brief, the government has suggested that defendants' challenge to the jurisdiction of the United States to prosecute them is improper because it is beyond the issue of "seizure" preserved by the stipulation. We reject the government's suggestion.

■ A question as to the court's jurisdiction to try a defendant may be raised at any time during the pendency of the proceedings. *See* Fed.R.Crim.P. 12(b).  Accordingly, in ruling in particular cases that a defendant who has pleaded guilty has waived his right to appeal or that his conditional plea has preserved only the specifically mentioned issues and waived all others, we have taken care to specify that the waiver applies only to defects that are "non-jurisdictional." *E.g., United States v. Doyle,* 348 F.2d 715, 718–19 (2d Cir.) (quoting *United States v. Spada,* 331 F.2d 995, 996 (2d Cir.), *cert. denied,* 379 U.S. 865, 85

S.Ct. 130, 13 L.Ed.2d 67 (1964)), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965).  Since it is a responsibility of the appellate court no less than of the trial court to see to it that the jurisdiction of the trial court, which is defined and limited by statute, is not exceeded, *Louisville & Nashville Railroad Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908), and since the stipulation is construed *infra* to preserve issues of fact and law arising from the stopping and boarding of the RICARDO as well as the seizure of marijuana, we will entertain on appeal defendants' challenge to the court's jurisdiction.

### B.  *The Constitutional Issues*

■ Notwithstanding the stipulation's preservation of the right to appeal "only" the lawfulness of the Coast Guard's "seizure" of the marijuana from the hold of the RICARDO, defendants have proceeded to challenge the lawfulness not only of the seizure itself but also of the Coast Guard's stopping and boarding of the vessel.  The government properly notes that the defendants have no Fourth Amendment right to challenge only the seizure.  As crew members of the RICARDO having no proprietary interest in the vessel's cargo and having no legitimate expectation of privacy in its cargo hold, defendants have no personal rights to vindicate in challenging the Coast Guard's search of the cargo hold or the seizure of the marijuana, and such a challenge would be rejected on that ground. *See United States v. Salvucci,* 448 U.S. 83, 99 S.Ct. 421, 58 L.Ed.2d 387 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Streifel,* 665 F.2d 414, 419 n. 6 (2d Cir.1981); *United States v. Williams,* 589 F.2d 210, 214 (5th Cir.1979).

---

**6.**  In addition, defendants Nunez-Riasco and Angulo-Quinones contend that their sentences were unduly harsh.  We find in their contentions no basis for reversal.  " 'The rule is well settled that a United States Court of Appeals is without power to review or revise a sentence which is within permissible statutory limits,' " *United States v. Lo Duca,* 274 F.2d 57, 59 (2d Cir.1960) (quoting *Roth v. United States,* 255 F.2d 440, 441 (2d Cir.), *cert. denied,* 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61 (1958)), in the absence of an indication that the sentence has been based on improper considerations or incorrect information, *see, e.g., United States v. Tramunti,* 513 F.2d 1087, 1120 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975).  The sentences imposed were below the possible maximum terms allowed by statute, and no improper consideration or misinformation has been called to our attention.

The government has not, however, disputed as unauthorized by the stipulation defendants' appeal from the district court's rulings upholding the Coast Guard's stopping and boarding of the RICARDO. In the circumstances, we shall, on this occasion, give the parties to the stipulation the benefit of the doubt and infer that they and the court understood that defendants were to preserve their right to challenge such actions leading to the seizure as they had the right to challenge, *i.e.,* the Coast Guard's stopping and boarding of the RI-CARDO.[7] In the future, however, we shall expect the parties to use care and precision in framing the issues to be preserved for appeal.

## III. JURISDICTION

Defendants attack the court's jurisdiction on two fronts. They contend that the district court's ruling that the RICARDO was stateless had an insufficient foundation and that since the RICARDO was not shown to be stateless it was not subject to the jurisdiction of the United States within the meaning of § 955a(a). In addition they contend that even if the RICARDO was stateless, it was not subject to prosecution in United States courts because there was no showing of any nexus between the United States and the RICARDO. While we reject the latter contention, we find some merit in the first.

### A. *Statelessness*

■■■ The district court cited four factors that led it to conclude that the RICAR-DO "at the very least, . . . when seized, was a vessel 'assimilated to a stateless vessel,' and at best, . . . was a vessel without nationality." (9/30 Tr. at 30.) The first two factors—that when first sighted the RI-CARDO was flying no flag, and that after being sighted the RICARDO changed course and headed away from the United States mainland—are, by themselves, wholly inadequate to support a finding of statelessness. The third factor—that flags of several states were found aboard the RI-CARDO—also is inconclusive. The RICAR-DO was observed flying only the Venezuelan flag, and its crew claimed that it was of Venezuelan nationality.[8] There was no evidence that it at any time "sail[ed] under" any flag other than that of Venezuela, using those other flags "according to convenience" within the meaning of Article 6, paragraph 2 of the Convention on the High Seas. Further, Ensign Willis testified that he did not consider it unusual to find flags of several countries on the RICARDO because it is common practice for a ship of one nationality to fly the flag of another country, in addition to that of its own country, upon entering the foreign country's port. Thus, the finding of the flags of several states aboard the RICARDO did not provide a sound basis for concluding that the RI-CARDO was assimilated to a ship without nationality.

■■■ The propriety of the court's conclusion that the RICARDO was stateless thus depends upon whether the district court properly relied on its fourth factor, the Venezuelan Certificate showing that the vessel's Venezuelan registration had expired in 1980. Despite its claim at the suppression hearing that it relied only on Fed.R.Evid. 803(8) as the basis for admissibility of the Certificate, the government here invokes both Rule 803(8) and Rule 803(10). We conclude that neither of these

---

**7.** We shall assume that the district court, which approved the conditional plea agreement, also so understood, for without court approval, the reservation agreement would be ineffective. *See, e.g., United States v. Sykes,* 697 F.2d 87, 89 (2d Cir.1983); *United States v. Mann,* 451 F.2d 346, 347 (2d Cir.1971) (per curiam).

**8.** We find inapposite the cases relied on by the government to support its contention that it adequately established the RICARDO's state-lessness, since each case involved fraudulent or dual claims of nationality. *See, e.g., United States v. Marino-Garcia,* 679 F.2d 1373 (11th Cir.1982) (vessel registered in Honduras, but crew claimed her nationality was "Miami, Florida"); *United States v. Dominguez,* 604 F.2d 304 (4th Cir.1979) (vessel displayed Bahamian flag, but crew claimed vessel was of British nationality), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980).

exceptions to the hearsay rule authorized the district court's receipt of the document into evidence.

Fed.R.Evid. 803(10) provides that the following category of evidence is not excluded by the hearsay rule:

> (10) *Absence of public record or entry.* To prove the absence of a record, report, statement, or data compilation, in any form, or the nonoccurrence or nonexistence of a matter of which a record, report, statement, or data compilation, in any form, was regularly made and preserved by a public office or agency, evidence in the form of a certification in accordance with rule 902, or testimony, that diligent search failed to disclose the record, report, statement, or data compilation, or entry.

At the hearing the district court ruled that the Venezuelan Certificate did not qualify as an absence of public record, and we believe this ruling was correct. What is envisioned by Rule 803(10) is a statement that, after a diligent search of the records regularly kept by a public office or agency, a certain record, entry, report, etc., has not been found. *United States v. Yakobov,* 712 F.2d 20, 26–27 (2d Cir.1983). From such a statement the factfinder may infer that an event that normally would be reflected in the public record did not occur. Instead of a certification of an absence of record, the Venezuelan Certificate is principally a potpourri of descriptions of existing records (*e.g.,* confirming that the RICARDO had been registered in Venezuela), speculation (stating that the RICARDO "evidently sailed clandestinely from Venequelan [*sic*] port"), description of official action ("the Maritime Authority has found grounds for the expiration of [the RICARDO's] registration"), and statement of legal conclusion ("in view of the expiration of its registration, as of May 21, 1980, [the RICARDO] could not invoke the Venezuelan nationality to protect its status under any circumstance, particularly in situations involving a crime or infraction"). Only after the descriptions of existing records, speculation, past government actions, and legal conclusion does the Venezuelan Certificate make a

statement that could possibly be construed, in part, as certifying the absence of a record: it states that "[r]einstatement" of the RICARDO's status as a Venezuelan vessel "would have required the renewal of its documents, after justifying its absence and receiving a favorable decision from the Venezuelan authorities, something that did not ever take place." Assuming that this means that there is no record of a request for reinstatement, a statement that Venezuelan records reveal no application for reinstatement is virtually meaningless standing alone. Its significance depends on the Certificate's earlier statements, most particularly on that describing the Venezuelan authority's revocation of the RICARDO's registration: without knowing of the revocation, one cannot draw an inference of nonregistration from a failure to seek reinstatement. Hence we regard the Venezuelan Certificate as inappropriate for receipt in evidence under Rule 803(10), and we reject the government's attempt to invoke that rule on this appeal.

Nor do we find the Venezuelan Certificate admissible under Rule 803(8), the rule under which it was offered in the district court. Rule 803(8) provides that certain types of records and reports are not excluded by the hearsay rule:

> (8) *Public records and reports.* Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, or (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

An examination of the Certificate reveals that both as a whole and in pertinent part the Certificate runs afoul of Rule

803(8)(C)'s exclusion of "factual findings resulting from an investigation made pursuant to authority granted by law" against defendants in criminal cases.

First, we note that the Certificate, made by the District Director General of Water Transportation, does not fit within either part (A) or part (B) of Rule 803(8), as it sets forth neither the activities of an office or agency nor matters observed by the District Director General. Rather, the Certificate purports to report the factual findings of the District Director General as a result of his investigation into the RICARDO's status in his "exercis[e of] the attributes conferred upon him by law." Further, the very part of the Certificate on which the court focused for its finding that the RICARDO's Venezuelan registration had expired, *i.e.,* the statement that "the Maritime Authority has found grounds for the expiration of its registration" "as of May 21, 1980," indicates that the Maritime Authority made an investigation resulting in its finding that grounds existed for the revocation of the registration. We thus conclude that neither the Certificate as a whole nor the part of the Certificate disclosing the revocation of registration was admissible against the defendants under Rule 803(8)(C). Further, since the reason for Rule 803(8)'s nonauthorization of the use of investigative findings against defendants in criminal cases is to avoid abridgment of a defendant's Sixth Amendment right of confrontation, see Fed.R.Evid. 803(8)(C) advisory committee note; *United States v. Oates,* 560 F.2d 45, 69–84 (2d Cir.1977), admission of such investigative findings against defendants in criminal cases is also not authorized by Rule 803(24), the "catchall" exception for trustworthy hearsay. *Id.* at 78.

Nor do we see that the contents or circumstances of the Certificate should inspire any particular confidence in its trustworthiness. The Certificate contains obvious speculation as to the RICARDO's "evident[ ]" "clandestine[ ]" movement, and has an aura of eagerness to deny the RICARDO the ability to "invoke the Venezuelan nationality to protect its status . . . in situations involving a crime or infraction."

Most importantly, the Certificate, which does not identify the "Maritime Authority" that apparently revoked the RICARDO's registration, also does not state *when* that Authority took its action, and there is nothing to indicate that the finding of grounds for expiration was not made after the Coast Guard intercepted the RICARDO and inquired as to its registration. If the Maritime Authority's action did precede the Coast Guard's involvement with the RICARDO, one might expect the Certificate to contain a plain statement that the RICARDO was unregistered in Venezuela on June 27 when it was boarded by the Coast Guard. The absence of such a straightforward statement and the silence of the Certificate as to the date of the Authority's action are circumstances suggesting that the Certificate lacks the trustworthiness necessary to support its admission as proof that the RICARDO was stateless on June 27.

In sum, we conclude that the Certificate was improperly received by the district court to show the RICARDO's statelessness. As none of the other evidence presented by the government established that fact, there was no substantial basis for the court's ruling that the RICARDO was subject to the jurisdiction of the United States within the meaning of § 955a(a). We therefore remand to the district court for such further proceedings on defendants' jurisdictional challenges as may be appropriate. If the government adduces no new evidence sufficient to show that the RICARDO was stateless, the indictment must be dismissed.

## B. *The Nexus Contention*

Defendants contend that even a proper finding that the RICARDO was stateless would not establish that the vessel was subject to the jurisdiction of the United States since international law prohibits a state's exercise of penal jurisdiction over a stateless vessel on the high seas unless there is some nexus between the state and the vessel. We disagree with defendants' interpretation of international law.

First, we note that in enacting statutes, Congress is not bound by international law. *Rainey v. United States,* 232 U.S. 310, 316, 34 S.Ct. 429, 431, 58 L.Ed. 617 (1914); *Whitney v. Robertson,* 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). If it chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law. As long as Congress has expressly indicated its intent to reach such conduct, "a United States court would be bound to follow the Congressional direction unless this would violate the due process clause of the Fifth Amendment." *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1334 (2d Cir.1972). *Accord, United States v. Howard-Arias,* 679 F.2d 363, 371 (4th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982).

Our review of the language and history of § 955a *et seq.* persuades us that, assuming that the RICARDO was stateless, Congress intended these sections to reach the conduct of the defendants in this case. In § 955a(h), Congress expressly stated its intention to reach acts committed "outside the territorial jurisdiction of the United States." In addition, in the legislative history of § 955a, there is evidence that Congress had as a primary goal the ability to reach stateless possessors of narcotics who could not be proved to have intent to distribute the narcotics in the United States. The Senate Report accompanying H.R. 2538, which noted the technical amendments the Senate Committee made to the bill before it was enacted as § 955a, stated that "the bill [was] intended to address acts committed outside the territorial jurisdiction of the United States." S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News, p. 2785. Experts who testified at the hearing on H.R. 2538 noted that many drug traffickers responsible for transporting drugs that ended up in the United States were able to travel with impunity over the high seas because of the then-existing requirement that the traffickers intend to distribute the drugs in the United States before being subject to prosecution there. The difficulty of proving intent allowed many such traffickers to go free, although their wares were in fact intended to be distributed in the United States. *Coast Guard Drug Law Enforcement: Hearings on H.R. 2538 Before the Subcommittee on Coast Guard and Navigation of the House Committee on Merchant Marine and Fisheries,* 96th Cong., 1st Sess. 48 (1979) ("*Hearings*") (statement of Peter B. Bensinger, Administrator of the United States Drug Enforcement Administration); *id.* at 65, 68 (statement of Michael P. Sullivan, Assistant United States Attorney, Chief, Criminal Division, Southern District of Florida). Section 955a was enacted to close this loophole. Thus, the House of Representatives Report accompanying H.R. 2538 observed that United States jurisdiction was to be extended to "vessels without nationality on the high seas," and that "[a]ny person on board such a vessel, of either U.S. or foreign citizenship, is prohibited from . . . possessing with the intent to . . . distribute any controlled substance." H.R.Rep. No. 323, 96th Cong., 1st Sess. 9 (1979). The Report noted that "[t]he intent to distribute need not be within the United States. Moreover, the intent element may be inferred by proof of a presence of a large quantity of the narcotic or dangerous drug, giving rise to the inference of trafficking," *id.* at 10, and that "it would not be necessary to prove that the vessel or the controlled substance was bound for the United States," *id.* at 12. Congress's explicit intention, therefore, was to extend the reach of § 955a to foreigners on stateless vessels on the high seas who possess large quantities of narcotics that they may or may not intend for distribution in the United States.

Defendants point out that despite this explicit intention, Congress also expressed its intention that § 955a be consistent with the strictures of international law, *see, e.g.,* H.R.Rep. at 11 ("section [955a] is designed to prohibit all acts of illicit trafficking in controlled substances on the high seas which the United States can reach under

international law"),[9] and they argue that international law permits the extension of the jurisdiction envisioned by Congress only if there is some nexus between the vessel and the state seeking to assert jurisdiction. Defendants' argument fails, however, since it apparently was Congress's understanding—and correctly so—that international law does not provide such protection to vessels that are stateless.

One of the basic principles of international law is that "all nations have an equal and untrammelled right to navigate on the high seas." *United States v. Marino-Garcia,* 679 F.2d 1373, 1380 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 748, 74 L.Ed.2d 967 (1983); *see* Convention on the High Seas Art. 2. With this right, of course, comes responsibility. To preserve all nations' freedom to travel on the high seas and to avoid conflict among nations, Article 2 of the Convention provides that each state must exercise its right "with reasonable regard to the interests of other States in their exercise of the freedom of the high seas."

To enforce compliance with these principles among individual ships traveling on the high seas, Articles 5 and 6 of the Convention provide that a ship has the nationality of the state whose flag it flies and that the ship is subject to that state's jurisdiction. Each state has the responsibility of fixing the conditions "for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag. . . . [I]n particular, the State must effectively exercise its jurisdiction and control in administrative, technical and social matters over ships flying its flag." *Id.* Art. 5. To eliminate any confusion over which state has jurisdiction over a ship, Article 6 provides that a ship may sail under the flag of only one state and that while doing so, it is generally subject to that state's exclusive jurisdiction. A ship may not change flags during a voyage except when a real transfer of ownership or registry occurs, and a

ship that flies under the flags of more than one state, claiming the nationality of whichever it deems convenient, is considered to be a ship without nationality that may not claim the protection of any of the nationalities in question. *Id.*

The suggestion underlying these principles is that a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity. There is ample evidence that Congress properly understood that these principles were consistent with its desire that § 955a reach stateless vessels on the high seas whether or not the narcotics carried were intended for distribution in the United States. During the hearings on H.R. 2538, Congress was repeatedly presented with statements by experts, reflecting what was apparently a common understanding among those interested in the bill, that the United States could, consistent with international law, assert jurisdiction over stateless vessels on the high seas. *See, e.g., Hearings, supra,* at 48 (statement of Peter B. Bensinger, Administrator of the United States Drug Enforcement Administration) ("We can, under both international law and United States case law, assert jurisdiction over these [stateless] vessels . . . ."); *id.* at 51 (statement of Robert Chasen, Commissioner of the United States Customs Service) (" 'Stateless' vessels . . . also present prosecutorial problems, although permission to board is not required."); *id.* at 55 (statement of Morris D. Busby, Director of Ocean Affairs, OES Bureau, Department of State) ("There is also an exception [to international law] which allows us to board a vessel on the high seas which is without nationality . . . .").

In light of these principles and Congress's manifest intentions, courts have agreed uniformly that stateless vessels on the high seas are, by virtue of their statelessness,

---

**9.** The Senate Report accompanying H.R. 2538 similarly stated that the bill "would give the Justice Department the maximum prosecutori-

al authority permitted under international law." S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980).

subject to the jurisdiction of the United States. *United States v. Marino-Garcia, supra,* 679 F.2d at 1382–83 (construing § 955a); *United States v. Howard-Arias, supra,* 679 F.2d at 371 (same); *United States v. Rubies,* 612 F.2d 397, 403 (9th Cir.1979) (construing 14 U.S.C. § 89(a)), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); *United States v. Dominguez,* 604 F.2d 304, 308 (4th Cir.1979) (same), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980); *United States v. Cortes,* 588 F.2d 106, 109 (5th Cir.1979) (same); *see United States v. Monroy,* 614 F.2d 61, 64 (5th Cir.) (implicitly construing 14 U.S.C. § 89(a)), *cert. denied,* 449 U.S. 892, 101 S.Ct. 250, 66 L.Ed.2d 117 (1980). As the court in *Marino-Garcia* put it,

> [v]essels without nationality are international pariahs. They have no internationally recognized right to navigate freely on the high seas. . . .  Moreover, flagless vessels are frequently not subject to the laws of a flag-state. As such, they represent "floating sanctuaries from authority" and constitute a potential threat to the order and stability of navigation on the high seas. . . .
>
> The absence of any right to navigate freely on the high seas coupled with the potential threat to order on international waterways has led various courts to conclude that international law places no restrictions upon a nation's right to subject stateless vessels to its jurisdiction. . . . Thus, the assertion of jurisdiction over stateless vessels on the high seas in no way transgresses recognized principles of international law.

679 F.2d at 1382 (citations omitted).

We find inapposite the authorities invoked by defendants in their effort to show that a nexus must exist before the United States may exercise jurisdiction over a stateless vessel on the high seas. The nexus requirement has been applied only to a vessel that is registered with, and is flying the flag of, one state to whose jurisdiction it has submitted. *See, e.g., United States v. Cadena,* 585 F.2d 1252, 1257–58 (5th Cir. 1978). *See also* Restatement (Second) of Foreign Relations Law of the United States §§ 18, 28, 33, 34 (1965). In such cases, international law requires the state seeking to assert jurisdiction to show a nexus between it and the foreign vessel that is sufficient to justify supplanting the flag state's normally "exclusive jurisdiction" granted by Article 6 of the Convention on the High Seas. Only a limited number of such nexuses have been found to be sufficient to warrant permitting a state to assert jurisdiction over another state's vessel. Restatement (Second) of Foreign Relations Law of the United States §§ 18 (vessel engaged in illegal activity intended to have an effect in the state), 33 (vessel engaged in an activity that threatens the state's security or governmental functions), 34 (vessel engaged in a universally prohibited activity, such as piracy) (1965). *See United States v. Marino-Garcia, supra,* 679 F.2d at 1380–82. But we find no authority in international law for requiring any nexus where the ship otherwise would be subject to the jurisdiction of no state.

We conclude, therefore, that international law provides no bar to an assertion of jurisdiction over a stateless vessel by the United States pursuant to § 955a(a), even absent proof that the vessel's operators intended to distribute their cargo in the United States. *Accord, United States v. Marino-Garcia, supra,* 679 F.2d at 1383; *United States v. Howard-Arias, supra,* 679 F.2d at 372. Consequently, we conclude that a properly supported finding by the district court that the RICARDO was stateless would, in itself, be sufficient to establish the court's jurisdiction over the defendants.

## IV. CONSTITUTIONALITY OF THE STOP AND BOARDING

The district court rejected defendants' constitutional challenges to the Coast Guard's stopping and boarding of the RICARDO principally on the ground that these actions were appropriate in light of the Coast Guard's reasonable suspicion that the vessel was engaged in illegal activity.

We see no basis for overturning this ruling.[10]

Since the district court found, implicitly if not explicitly, that the Coast Guard's stopping and boarding of the RICARDO did not amount to an arrest of the defendants, probable cause for the Coast Guard's action was not required. *See United States v. Streifel,* 665 F.2d 414, 421 (2d Cir.1981). Rather, since the stopping and boarding constituted an investigatory stop, those actions were lawful if the Coast Guardsmen were " 'aware of specific articulable facts, together with rational inferences from those facts that reasonably warrant[ed] suspicion' that the individual . . . was, or [was] about to be engaged in criminal activity." *Id.* (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)). To determine whether an officer's suspicion was reasonable, the "totality of the circumstances" must be considered, *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981), and "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968).

Here the Coast Guard officers had reasonable, articulable factual grounds for suspecting that the RICARDO was engaged in drug smuggling. The Coast Guard officers who decided to intercept and investigate the RICARDO were experienced law enforcement officers who were practiced in the detection and prevention of drug smuggling activities on the seas. They had observed that the RICARDO was a fishing vessel in disrepair with no active fishing gear, that the vessel's waterline was painted artificially high (a circumstance that suggested an effort to make the vessel appear empty when in fact it was carrying cargo), that the name of the vessel was crudely painted, that the vessel was flying no flag, and that it had changed course after its detection so that it was headed away from the mainland by the time the Coast Guard cutter drew near. Ensign Willis testified that in his experience, these characteristics were often exhibited by drug smuggling vessels, and a computer search indicated that the RICARDO had been seen recently in a known drug exporting port in Colombia. In addition, there was evidence that officers on the DUANE smelled the odor of marijuana emanating from the RICARDO. Although defendants challenge Haas's testimony to this effect on the ground that it is incredible, and the testimony does appear to bespeak unusually sensitive olfactory nerves, we cannot say that the testimony was incredible as a matter of law. Thus, we may not disturb the decision of the district judge, who had the opportunity to view and assess the demeanor of the witness, to credit Haas's testimony. Given the above circumstances, the district court's finding that the stop was justified by the Coast Guard's reasonable suspicion must be sustained.

Finally, we find no basis for concluding that the Coast Guard's stopping and boarding of the vessel were accomplished in an unreasonably intrusive manner. The RICARDO stopped immediately upon being asked to do so, a request which followed the RICARDO crew member's thumbs-up signal

---

10. Since we uphold the ruling that the Coast Guard's actions were justified by reasonable suspicion, we need not rule on the district court's finding that the stop and boarding were permissible because of the defendants' consent. Defendants contend that there was no meaningful evidence to show that they consented, in part because the communications that preceded the crew member's thumbs-up signal did not intelligibly request such consent. We have set forth in note 3 above the requests that were, according to government witnesses, communicated to the defendants. There seems little doubt that, if the testimony at the suppression hearing be accepted, the requests were garbled. According to one witness, Haas, the request was for permission to "embarque tu barco," which both of the interpreter witnesses testified sought permission to "ship your ship" and said nothing about boarding. According to Dillman, who actually made the request, she asked permission to "embajar a su barco"; but the word "embajar" does not exist in Spanish.

in response to the Coast Guard's attempted request to board. The Coast Guard made no show of force to accomplish the stopping. Nor was force used in the boarding. The court found that although the boarding party carried weapons, they kept their weapons pointed in the air and never aimed them at the defendants. Likewise, the machine gun aboard the DUANE was always pointed in the air rather than at the RICARDO, and the DUANE's five-inch gun was never loaded or manned.

Given the governmental interest in preventing the smuggling of narcotics into the United States, we conclude that in the totality of the circumstances, including the facts that the RICARDO was originally seen to be headed on a course toward the United States mainland, that there was a reasonable basis for suspecting that the RICARDO was engaged in smuggling marijuana, and that there was a minimal show of force in connection with the stopping and boarding, defendants' constitutional challenge to the stopping and boarding was properly rejected. With that rejection, any challenge by the defendants to the lawfulness of the seizure of the marijuana must also fail, since defendants have no personal rights, *see* Part II.B. above, to challenge the seizure independently of the events that preceded it. *United States v. Williams, supra,* 589 F.2d at 214.

### CONCLUSION

The judgments of conviction are vacated and the matter is remanded to the district court for such further proceedings as may be appropriate with respect to the question of the jurisdiction of the United States over the RICARDO.