UNITED STATES of America

v.

Donald S. JONES.

Crim. No. 86–264.

United States District Court,
W.D. Pennsylvania.

April 9, 1987.

---

John J. Mead, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Bruce A. Antkowiak, Mansmann, Cindrich & Titus, Greensburg, Pa., for defendant.

## MEMORANDUM OPINION

DIAMOND, District Judge.

Before us is defendant's motion to suppress physical evidence. Finding that the arresting officers did not have reasonable suspicion to stop and frisk defendant, we grant defendant's motion and suppress all items seized from him at the time of his arrest.

### Background

We held a hearing on defendant's motion to suppress on February 19, 1987. Since our disposition of this motion largely turns on our evaluation of the credibility of the witnesses and the plausibility of their testimony, we will recount the testimony in some detail.

The government presented the testimony of the two arresting officers, City of Pittsburgh police officers Anthony Charles and Carlton Jones. Officer Charles testified that at about 10:30 P.M. on June 12, 1986, he and Officer Jones went to the intersection of Centre Avenue and Elmore Street to investigate a tip that two men with handguns planned to kill a drug peddler. (Suppression Hearing Transcript ("S.T.") 6). They met at least four to six other officers at that intersection. (S.T. 22).

According to Officer Charles, in the General Store, which occupied one of the four corners (*see* defendant exhibit 8) two other officers, Walls and Drummond, stopped and searched a man, a Mr. Crews, who matched the description of one of the two suspected gunmen. (S.T. 7–8, 42). They found two handguns on Crews and arrested him. (S.T. 7–8). Officer Charles was present in the General Store when the search and arrest took place. (S.T. 8). While in the General Store this first time, Officer Charles did not notice the defendant, Mr. Jones. (S.T. 30).

Officers Walls and Drummond left with Crews. (S.T. 9). Officer Charles followed them out of the General Store; he was the last police officer to leave. (*Id.*). He and Officer Jones remained behind on the sidewalk on the Elmore Street side of the corner to disperse the crowd that had gathered and to protect the other officers from bottle and rock throwers. (*Id.*).

Officer Charles testified that while he was on the sidewalk, a woman approached him and told him that there was another man in the General Store with a gun. (S.T. 32–34). She gestured toward the store. As soon as she gave Officer Charles this information, she left. (*Id.; see also* 69–70). Officer Charles did not recognize her and could describe her only as a middle-aged black woman. (*Id.*). When Officer Charles turned toward the store, in the direction the woman gestured, he saw the defendant, Donald Jones, standing at a video game inside the store, with his right side facing Officer Charles. (S.T. 9, 34). Mr. Jones was not behaving suspiciously. (S.T. 43). At this point, Officer Charles was eight to nine feet outside the door. (S.T. 9). Mr. Jones was two to three feet inside the door, approximately twelve feet from Officer

Charles. (S.T. 10–11). The store's interior was well-lit. (S.T. 10).

Officer Charles testified that he immediately saw a gun clip and the entire grip of a handgun at Mr. Jones' waistline, on the right side. (S.T. 11–12, 40–41). Mr. Jones was wearing a waist-length jacket that rose up as he bent over the video game, exposing the clip and the grip of the gun at his right side. (S.T. 13). Officer Charles then consulted with his partner Officer Jones, who was standing at their car, which was parked outside the General Store on Elmore Street. (S.T. 13; *see* defendant exhibit 8). They approached Mr. Jones, Officer Charles from the rear, his gun drawn, and Officer Jones from the right. (S.T. 13–16). Officer Charles ordered Mr. Jones not to move as Officer Jones took the gun, a .38 caliber Smith and Wesson revolver, government exhibit 2, from Mr. Jones' right side. (*Id.*). Officer Jones then conducted a full body search and found another revolver in Mr. Jones' front waistband, handcuffs hanging at his left side, a knife, three speed loaders, and eleven loose rounds of ammunition in Mr. Jones' trouser pockets. (*Id.*). Two to three minutes had elapsed since the first arrest occurred in the General Store. (S.T. 41).

Officer Charles testified that Mr. Jones did not match the description of the two men described in the tip that initially brought the officers to the corner of Centre and Elmore. (S.T. 44, 50). Further, he testified that his own observation of the gun clip and gun grip at Mr. Jones' side, not the anonymous woman's tip, was the justification for the stop and search of Mr. Jones. (S.T. 54).

On cross-examination, Officer Charles admitted that he did not mention this anonymous woman in his arrest report, nor did he recount the tip at the preliminary hearing on the state charges against Mr. Jones arising from this same incident or to the federal case agent. (S.T. 36–37). Officer Charles explained these omissions as an attempt to protect the woman. (S.T. 38).

Officer Jones testified that he remained outside when Officer Charles first entered the store with Officers Walls and Drummond. (S.T. 57, 66). When he was about to enter their police car to leave, Officer Jones saw Officer Charles speaking with a woman. (S.T. 58, 69–70). On that night, Officer Jones did not recognize the woman, and at the hearing, Officer Jones could not describe her. (S.T. 69–70). After the conversation, Officer Charles relayed the tip to Officer Jones. (S.T. 59). Officer Jones looked into the store and saw a gun clip at Mr. Jones' side. (S.T. 59–60). At first, Officer Jones saw only the clip; the entire gun grip came into his view only when Officer Jones entered the General Store with Officer Charles and got a closer view. (S.T. 73–74). When Officer Jones reached Mr. Jones, Officer Jones immediately seized the gun at Mr. Jones' side. (S.T. 61–62). Officer Jones conducted the pat down that turned up the other weapons as Officer Charles held Mr. Jones at gunpoint. (S.T. 62–63).

Both officers denied that the jacket Mr. Jones wore in court at the suppression hearing was the jacket he was wearing when arrested, though Officer Jones was uncertain. (S.T. 13, 71, 141). At the hearing, Mr. Jones had on a maroon windbreaker that hung loosely to below his hips, around the top of his thighs. The officers testified that the jacket Mr. Jones had on that night was shorter, waist length.

The government introduced into evidence all the items seized from Mr. Jones. (Government exhibits 2, 3, 4). The gun and the holster with its clip that initially motivated the search are government exhibit number 2. The gun is silver-colored; its grip, a brown wood. The clip is silver, about three inches long and a half inch wide. When worn, the holster fits inside the pants, and the clip protrudes outside the pants and extends down towards the ground.

For the defense, Donald Jones testified that he was in the General Store on June 12, playing Ms. Pac-Man, a video game. (S.T. 82, 85–86; defendant exhibit 8). To his right were a cigarette machine and then the door. (*See* defendant exhibits 4, 5). He witnessed the police arrest Mr. Crews as Crews was leaving the store. (S.T. 84).

From where Mr. Jones stood, he could look through a window facing Centre Avenue. (S.T. 86–87). After the police left with Crews, Mr. Jones saw outside three patrol cars, three paddy wagons, and several officers. (*Id.*). He did not see any police officers looking at him. (S.T. 95).

According to his testimony, Mr. Jones first became aware of Officers Charles and Jones when Officer Charles tapped him on the back of the head with a gun. (S.T. 92). Officer Jones started his frisk of Mr. Jones on the left side and went around to the right, where he found the gun, government exhibit 2. (*Id.*).

Mr. Jones testified that when searched he was wearing the same maroon jacket he wore at the suppression hearing. (S.T. 83, 87–88). He wore it with only the top two buttons unfastened. (*Id.*). His intent in wearing that jacket on June 12 was to conceal the guns he was carrying. (S.T. 94–95).

At the suppression hearing, Mr. Jones demonstrated how the gun was concealed on June 12. (S.T. 88–92). He put government exhibit 2 inside his waistband on his right side and closed his jacket over it. To simulate the position in which he stood over the video game on June 12, he stood, placed his hands on the witness box, and bent slightly at the waist. (*See* defendant exhibits 10, 11, 12). In this position, no part of the gun or clip was visible. He opened his jacket to show the gun. (*See* defendant exhibit 13). The entire clip showed outside his pants. It extended to about three inches below his belt line. The grip of the gun rose to about four or five inches above his waist. Had Mr. Jones been wearing a waist-length jacket, the entire clip would have been visible beneath the jacket.

Defendant's witnesses David Saunders, William Stroman, and Edward McCants testified that they observed the arrest of Mr. Jones from various vantage points. As we did not find these witnesses credible, we will not describe their testimony. All three have extensive criminal histories. Messrs. Stroman and McCants are acquaintances of Mr. Jones.

Ms. Dorothy Jenkins, the proprietor of the General Store, testified that twenty people were in the General Store the night of June 12. The police stopped and frisked several other people besides Mr. Jones. (S.T. 105–113).

At the end of defendant's case, the court recalled Officers Jones and Charles to inquire about Mr. Jones' mental condition on the night he was arrested. Both officers testified that he was lucid and showed no indication of being drunk or under the influence of drugs. (S.T. 134–35, 140–41).

### Findings of Fact

Based on the testimony, the exhibits, and defendant's demonstration in court, we find the following facts.

Several police officers went to the corner of Centre Avenue and Elmore Street at about 10:30 P.M. on June 12, 1986, to investigate a tip that two men with guns intended to assassinate a drug peddler. Officers Walls and Drummond observed someone who fit the description of one of the individuals inside the General Store. The General Store is a small store, approximately twenty feet by sixteen feet, that straddles one of the corners at the intersection of Centre Avenue and Elmore Street. The General Store offers candy and cigarettes for sale and features video machines. The front door, which cuts across the corner at a diagonal, was open that night, and the interior of the General Store was well-lit.

Several of the police officers, including Officer Charles, entered the General Store and arrested Crews and seized two guns from him. Defendant Donald Jones was inside the General Store when this arrest took place. None of the officers searched or questioned Jones at this time; he did not meet the description of either of the two potential assassins in the tip that brought the officers to the corner of Centre and Elmore. Nothing indicated that he was associated with Crews.

When the officers removed Crews from the General Store, Officer Charles was the last to exit the store. Officer Jones had remained outside the General Store the whole time. As Officer Charles stood on

the sidewalk, a woman approached him and told him that she believed or thought someone in the General Store had a gun. She did not indicate the source of her information. Neither Officer Charles or Officer Jones had ever seen this woman before; neither officer could describe her. She did not identify herself, and she left the scene immediately after giving Officer Charles her one sentence tip. (S.T. 37–38, 49, 70). The officers have not seen her since and could not locate her if needed.

Consistent with the officers' testimony, we find that this anonymous informant did not describe or point out Mr. Jones. She merely gestured in the direction of the General Store. (S.T. 9, 32–34). Several people were in the General Store when she gestured toward it, but Mr. Jones was closest to the open door. He stood playing a video game. As the officers looked toward the General Store, Mr. Jones was the first person they saw, and he was the first person they encountered on the way into the General Store.

Mr. Jones knew that he illegally possessed several guns. The police had just arrested and searched Mr. Crews in the General Store. As Mr. Jones stood at the video machine, he could see several police cars outside the General Store. He knew that police were in the area. He intended to conceal his weapons. A gun clip hung at his right side and handcuffs at his left, both outside his pants. The handcuffs and all three inches of the clip would have been visible beneath a waist-length jacket, no matter the wearer's position. The gun grip extended four to five inches above Mr. Jones' waistline. To bare the entire grip, even a waist-length jacket would have had to ride up a considerable, uncomfortable distance—to mid-rib. From Mr. Jones' behavior at hearings where he represented himself before this court and his testimony at the suppression hearing, we find him to be intelligent. The officers testified that he was sober and lucid the night of June 12, 1986. We do not believe that he dressed or behaved so carelessly.

We find that no part of any gun or gun clip was visible to the police officers until after they searched Mr. Jones. Mr. Jones was wearing a maroon windbreaker that reached to the top of his thigh, and it was closed. It fully concealed the guns and the clip. No telltale bulges were apparent. He played a video game that had controls above waist level, so that he stood erect. His behavior seemed innocent.

Acting on the anonymous woman's tip, Officers Charles and Jones entered the General Store, scarcely two or three minutes after the arrest of Crews. There were several other people in the store besides Jones: the accounts vary from one, two (S.T. 72; testimony of Officer Jones), or three (T. 10; testimony of Officer Charles) to nine or ten (S.T. 94; testimony of Mr. Jones) or more (S.T. 108–109; testimony of Dorothy Jenkins). However, Jones was the first person the officers encountered as they entered the General Store, and the first person they searched. Officer Charles came up behind Mr. Jones, pointed his gun at Mr. Jones' back, and told him, "Don't move." Officer Jones frisked Mr. Jones and found first the .38 caliber revolver at his right side, then the rest of the weapons. The officers asked Mr. Jones if he were a police officer or if he had a license to carry these weapons, but he did not respond. They handcuffed Mr. Jones and led him away.

### Discussion

We assess the police officers' search of Jones under the reasonable suspicion standard set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and we focus on the seizure of the first gun. Despite the display of weapons, the officers' intrusion was brief and limited. This was initially an investigatory stop and frisk, not a full arrest. *United States v. Hardnett*, 804 F.2d 353, 357 & n. 1 (6th Cir.1986); *United States v. Aldridge*, 719 F.2d 368, 370–71 (11th Cir.1983). The officers did not inquire of Jones before searching him; their first contact with him was the frisk that revealed the gun at Jones' right side. If legal, the seizure of this gun authorized the officers to continue their search and eventual arrest. *See Adams v. Williams*, 407 U.S. 143, 148–149, 92 S.Ct.

1921, 1924–25, 32 L.Ed.2d 612 (1972). If illegal, this seizure taints the subsequent search. Thus, the validity of the search and seizure of Jones stands or falls on the legality of the officers' initial intrusion.

The government must prove the legality of a warrantless search. *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974). The government must persuade us by a preponderance of the evidence that specific articulable facts and the inferences that experienced police officers could draw from those facts gave rise to a reasonable suspicion that the defendant was committing a crime and that he was armed and dangerous. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883; *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir.1984). We must consider the totality of the circumstances; each case turns on its own facts. *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). We look at the objective facts, not at the officers' subjective intent: even if the police officers' professed reason for the search is incredible or insufficient, the search will be legal if the objective circumstances known to the officers would have justified a reasonable officer in taking these actions. *United States v. Hawkins*, 811 F.2d 210, 215 (3d Cir.1987).

Specific and articulable facts must direct a reasonable officer's suspicion to this particular defendant:

> Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity....
>
> [The totality of the circumstances] must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio, supra*, said that "this demand for specificity in the information upon which police action is predicated *is the central teaching of this Court's Fourth Amendment jurisprudence.*" *Id.* [392 U.S.] at 21 n. 18, [88 S.Ct. at 1880 n. 18] (emphasis added).

*Cortez*, 449 U.S. at 417–418, 101 S.Ct. at 695; *see also, Ybarra v. Illinois*, 444 U.S. 85, 91, 95, 100 S.Ct. 338, 342, 344, 62 L.Ed.2d 238 (1979) ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an unauthorized narcotics search is taking place.").

Applying these principles to the facts as we have found them, we hold that the officers did not have reasonable suspicion to believe that Donald Jones was committing a crime or that he was armed and dangerous.

As we evaluate the totality of the circumstances, three salient factors emerge. First, the initial tip of two armed men that brought the officers to Centre Avenue and Elmore Street did not direct any suspicion at Jones; quite the contrary. Five or more police officers looked through the General Store for men matching the tip's description. Given that the tip announced that a murder was to take place, we can assume that the officers looked thoroughly. They found one man matching the description, Crews, and arrested him. Jones was in the General Store at this time, but the officers did not consider him similar enough to the tip's description to make any inquiry of him. (S.T. 30). Nothing indicated that Jones was Crews' companion. *Compare United States v. Flett*, 806 F.2d 823 (8th Cir.1986) (upholding frisk of violent motorcycle gang member present in home of fellow gang member during arrest of home owner for narcotics violation). The officers left the General Store, leaving Jones untouched; apparently, they were satisfied that he was not the second armed man. Though the initial tip may have aroused understandable caution in the officers, the officers' investigation dispelled any suspicion of Mr. Jones' involvement in the assassination plot. In the total mix of circumstances, this tip counts for Jones and detracts from any reasonable suspicion directed towards him.

Second, the tip from the anonymous woman lacked any indicia of reliability.

Officer Charles testified that as he and Officer Jones stood outside the General Store after Crews was arrested and removed, a nondescript woman approached Officer Charles and told him that she thought or believed that someone in the General Store had a gun. (S.T. 9, 32–34). When only a *Terry* stop is at issue, we scrutinize an informant's tip less strictly. *See Adams v. Williams,* 407 U.S. at 147, 92 S.Ct. at 1923. Nevertheless, the tip must bear some indicia of reliability. *Id.; United States v. McBride,* 801 F.2d 1045, 1047 (8th Cir.1986); 3 LaFave, Search & Seizure, § 9.3(e), p. 102 (1978) (a failure to require some indicia of reliability in an informant's tip would encourage police officers to fabricate these tips to justify unreasonable searches). "A tip from an informant of unknown reliability will not create a reasonable suspicion of criminality." *United States v. Kent,* 691 F.2d 1376, 1379 (11th Cir.1982).

In *Adams, supra,* the Supreme Court upheld a frisk based on a tip "that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." 407 U.S. at 145, 92 S.Ct. at 1922. In finding the tip reliable, the Court stressed that the police officer knew the informant personally, and the informant had provided information to this officer in the past. *Id.* at 146, 92 S.Ct. at 1923. Since the officer knew the informant, and the informant personally approached the officer to give information that was immediately verifiable, the officer would have been able to hold the informant criminally responsible if the informant's report proved false. *Id.* at 146–147, 92 S.Ct. at 1923. Based on these facts, the Court found the tip reliable, distinguishing it from "tips, completely lacking in indicia of reliability, [that] would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized." *Id.* at 147, 92 S.Ct. at 1924.

Recently, in *United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court again took care to establish a tip's reliability before upholding a *Terry* stop based on it. In *Hensley,* the informant provided a "wealth of detail" concerning the crime. *Id.* at 233–234, 105 S.Ct. at 678–79. She also admitted her involvement in it, *id.,* a factor that has always weighed heavily in establishing an informant's reliability. *See, e.g., United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971).

In contrast, in *United States v. McLeroy,* 584 F.2d 746 (5th Cir.1978) (Wisdom, J.), the Fifth Circuit held that a tip from an unknown informant that "a black and white Chevrolet, 1977 Alabama license tag BMB023, was parked at 1720 27th Street in Ensley, Alabama," *id.* at 747, that the car was stolen, and that its possessor might have a sawed-off shotgun was insufficient to create reasonable suspicion to justify a stop of the car. The informant's identity or reliability was unknown. The tip did not indicate its basis. Most important, the officers' observations did not corroborate any suggestion of criminal activity contained in the tip. All that they observed of the defendant was innocent behavior. *Id.* at 748; *see also United States v. DeVita,* 526 F.2d 81 (9th Cir.1975) (untested informant's tip "that a Mr. DeVita would be transporting some type of narcotics, possibly to the Pittsburgh area, sometime in the near future" so lacked detail and corroboration that it could not support an investigatory stop).

Here, the police officers offer no reason to trust this tip. The woman was a stranger to them; they did not know if she was reliable. She did not linger on the scene after giving her tip, and she did not leave the officers any way to identify her or contact her. Thus, she could not be held responsible if her tip proved false. The tip did not indicate, and the police did not inquire into, the basis of her knowledge. While the informant's information could have come from personal observation, it could also have originated in rumors that the informant heard from anyone among the crowd that had gathered. *See Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969). The indefinite language of her tip—someone in the store "may still have a gun," (S.T. 9); "I believe that guy's got a gun," (S.T.

32–33)—suggests the source was rumor. Aside from the officers' seizure of the guns from Jones, the officers did not corroborate any part of the tip. It is well established that items seized cannot provide the justification for the seizure. *Sibron v. New York,* 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968).

Third, the tip was general. It lacked any detail that would demonstrate its veracity. The woman did not point out or specify Jones; she merely indicated that someone in the General Store might have a gun. (S.T. 9, 32–34). Jones happened to be closest to the door; he would be the first the police would search if they were to go through the General Store. At the time the police re-entered the General Store, there were, according to various accounts, anywhere from one to twenty other people in the store. Though Mr. Jones may have harbored evil designs, his outward appearance was innocent and unsuspicious. The police had no reason to believe that this "particular individual ... [was] engaged in wrongdoing." *Cortez,* 449 U.S. at 418, 101 S.Ct. at 695.

Even granting the anonymous woman's tip some reliability, the police knew only that Jones was in a store where someone might be armed. In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court condemned a *Terry* stop based on similar general information. In *Ybarra,* the police went to a bar to execute an arrest warrant for the bartender, who was suspected of selling narcotics. As the courts have recognized, firearms are a tool of the narcotics trade. 444 U.S. at 106, 100 S.Ct. at 350 (Rehnquist, J., dissenting). Nevertheless, the court held the frisk to be illegal:

> When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault and acted generally in a manner that was not threatening.... In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous....

> The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

444 U.S. at 93–94, 100 S.Ct. at 343. *See also Commonwealth v. Anderson,* 481 Pa. 292, 392 A.2d 1298 (1978); *People v. La-Pene,* 40 N.Y.2d 210, 222–226, 386 N.Y.S.2d 375, 352 N.E.2d 562 (1976) (both forbidding, on federal constitutional grounds, *Terry* stops based on anonymous tips containing general descriptions that could apply to any number of people in a bar).

The police here had even less reason to conduct an investigative stop and a protective frisk than the officers in *Ybarra.* In *Ybarra,* the officers entered the bar to execute a valid warrant. Their duty obligated them to be in a bar where narcotics were sold, in the midst of nine to thirteen other people. In the present case, the police had finished investigating the tip that initially brought them to the General Store, and they had left the store. They did not have to re-enter and put themselves in peril. Confronted with this vague and unreliable tip, they could have recognized its insufficiency and walked away. *See Terry,* 392 U.S. at 32–33, 88 S.Ct. at 1885–86 (Harlan, Jr., concurring); 3 LaFave, § 9.4(a), pp. 109–110, 119. Or, they could have inquired further, gathering specific, articulable facts before taking action.[1]

---

1. This is not a case where the police officers had no other option, so that application of the exclusionary rule could not result in "appreciable deterrence." *See United States v. Leon,* 468 U.S. 897, 909, 104 S.Ct. 3405, 3413, 82 L.Ed.2d 677 (1984); *United States v. Bell,* 762 F.2d 495, 498 n. 1 (6th Cir.1985).

*Conclusion*

The police officers lacked reasonable suspicion to stop and frisk the defendant. This search violated the Fourth Amendment. All the items taken in that search must be suppressed.

An appropriate order will be entered.